[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court for decision is a motion filed by defendant Robert R. Picerno to suppress certain of his alleged verbal and written statements and other tangible evidence at trial. The State of Rhode Island has charged defendant Picerno, a former member of the Lincoln Planning Board, with four counts of soliciting or attempting to solicit a bribe and three counts of conspiracy to do the same in violation of R.I. Gen. Laws §§11-7-3 and 11-1-6 (1956). This Court conducted a suppression hearing from November 17, 2003 to November 20, 2003, after which the parties filed extensive legal memoranda. In December 2003, on the eve of this Court rendering its decision on the defendant's suppression motion, the defendant moved for postponement of that decision and subsequently moved to reopen the suppression hearing. At the request of defendant Picerno, the Court postponed its initial decision and granted the defendant's motion to reopen the suppression hearing. It accepted additional evidence in support of and in opposition to the defendant's motion to suppress on January 12 and 13, 2004.
Defendant Picerno moves to suppress all of the statements he made from the time period following his arrest on February 15, 2002 at 1:30 p.m. through the conclusion of his recorded statement in the late afternoon of February 16, 2002. Defendant Picerno also seeks to suppress the tangible evidence seized from his residence on the evening of February 15, 2002. Defendant Picerno maintains that the State violated his state and federal constitutional rights against self-incrimination, right to effective assistance of counsel, and freedom from unreasonable searches and seizures, so as to warrant suppression of all of this evidence at trial.[1] For the reasons set forth in this Decision, this Court denies defendant Picerno's motion to suppress in its entirety.[2]
 I. FINDINGS OF FACT A. Arrest
At 1:30 p.m. on February 15, 2002, detectives of the Rhode Island State Police Financial Crimes Unit arrested defendant Picerno as he exited the offices of Major Construction in West Warwick, Rhode Island Present at the scene were Sergeant Brian K. Casilli, Lieutenant Stephen Bannon, Inspector Elwood N. Johnson, Jr., and Corporal John Lemont. Although defendant Picerno began his direct testimony at the suppression hearing by describing his arrest as a violent one in which he was jumped by nine or ten police officers and forcefully pushed down onto the top of a police cruiser, a videotape of the arrest introduced into evidence by the State showed nothing of the sort; the arrest was conventional, swift, calm, and involved only four police officers. This example of gross exaggeration and distortion of the facts by defendant Picerno to try to show overreaching by the police — which became apparent to the Court even before his cross-examination — set the tone for defendant Picerno's testimony. It would be the first of many such moments during the suppression hearing that would serve only to undermine defendant Picerno's credibility and corroborate the opposing testimony of the State's witnesses.
Upon handcuffing defendant Picerno and taking him into custody, Detective Casilli told defendant Picerno that he was under arrest for bribery and corruption and would be taken to state police headquarters. Detective Bannon then verbally advised defendant Picerno of his Miranda rights[3] with the assistance of a small card on which the rights were printed. After being informed of his rights, defendant Picerno indicated that he understood them.
Detectives Casilli and Lemont transported defendant Picerno in an unmarked detective car to State Police headquarters. While in the car, Detective Casilli again advised defendant Picerno of hisMiranda rights. The trip took approximately twenty-five minutes, during which time the parties engaged in "casual conversation" and "general pleasantries"; the parties discussed nothing of substance to the investigation. Defendant Picerno acknowledged during the ride that he knew he was in serious trouble. Upon arriving at State Police headquarters, the detectives placed defendant Picerno in an interview room with dimensions of approximately twelve feet by eighteen to twenty feet. At some point soon thereafter, the detectives removed defendant Picerno's handcuffs.
 B. Afternoon Interrogation
Before speaking with defendant Picerno, at approximately 2:15 p.m., Detectives Casilli and Lemont again advised him of hisMiranda rights via a written, standard form. Detective Casilli first read the rights to defendant Picerno and then gave the rights form to defendant Picerno to read. Detectives Casilli and Lemont were present while defendant Picerno read and initialed each paragraph of the rights form. All three parties placed their signatures at the bottom of the form.
Detectives Casilli and Lemont then told defendant Picerno that they wanted to speak with him and asked the defendant if he was willing to answer some questions. Defendant Picerno agreed to speak with them. The discussion began at approximately 2:30 p.m. At no time before this discussion had defendant Picerno requested the assistance of an attorney.
Detectives Casilli and Lemont questioned defendant Picerno for the next two to two and one-half hours. Defendant Picerno was not fully cooperative with the questioning. The detectives thought that he was "holding back" information. Defendant Picerno admitted as much at the suppression hearing, while also conceding that he volunteered some information. The detectives would tell defendant Picerno about information they had about his activities, and he would be asked to acknowledge certain facts. Defendant Picerno was aware from the officers' statements that his phones had been tapped, as there would have been no way for them to know certain information otherwise. Throughout the afternoon questioning, the detectives did not threaten defendant Picerno, use physical force, or make any promises; yet the detectives would "press certain issues" and "re-ask questions in different ways." Defendant Picerno never asked to stop the questioning or requested the assistance of legal counsel. The State Police continued to monitor defendant Picerno's telephones as part of their ongoing electronic surveillance.
After the detectives had questioned him about several topics of their investigation, defendant Picerno expressed an interest in cooperating and offered to "give [the detectives] Oster" in exchange for "a deal."[4] The time was now approximately 5:00 p.m. No one other than the two detectives had met yet with defendant Picerno. The detectives informed defendant Picerno that deals were the prerogative of the Assistant Attorneys General. Defendant Picerno then asked to speak with the prosecutors.
The detectives next told Assistant Attorneys General William Ferland and Stephen Dambruch (the "Assistant Attorneys General"), who were involved in the investigation and standing by outside the interrogation room, that defendant Picerno wanted to cooperate in exchange for a deal. The prosecutors met briefly with defendant Picerno to discuss his cooperation options while the detectives waited just outside the room. The Assistant Attorneys General agreed to refrain from prosecuting defendant Picerno's wife and son in exchange for defendant Picerno's cooperation.[5] The prosecutors in no way indicated that if defendant Picerno failed to cooperate, they would prosecute his wife and son. Defendant Picerno, not being interested in what they could do for his family, then asked what they could do forhim; the prosecutors made no specific promises regarding jail time for the defendant.
 C. The Late Afternoon: Call to Jonathan Oster and Attempt to Record Statement
Defendant Picerno then agreed to call Jonathan Oster to set up a "sting operation" for the following morning.[6] The prosecutors informed defendant Picerno that if he wanted to benefit from cooperation, he and they would have to act quickly in setting up a meeting between defendant Picerno and Oster, before news spread of defendant Picerno's arrest. Defendant Picerno placed the call to Oster from his cellular phone shortly after 5:00 p.m. As he could not reach Oster by phone at that time, defendant Picerno left a message for Oster to return his call.
The State Police did not record the interrogation or any verbal statements defendant Picerno made during the afternoon on either audio or video tape; instead, Detective Casilli memorialized those statements in his notes and then later incorporated his notes into his activity report. Detective Casilli testified that it is standard procedure to review information verbally with a suspect before seeking a formal taped or written statement.
After defendant Picerno left the message for Oster, however, Detectives Casilli and Lemont then tried to get a formal, taped statement from defendant Picerno. Defendant Picerno hesitated and expressed a concern that he might be "screwing" himself by recording a statement without a deal. He also questioned whether he should have a lawyer to finalize their deal before recording a statement. Defendant Picerno did not ask for an attorney; he merely asked whether he should have an attorney. The detectives conferred and, out of an abundance of caution, suggested to defendant Picerno that he might want to contact an attorney. The parties took a break and the detectives made available to defendant Picerno a conference room, telephone, and phonebook. At approximately 5:30 p.m., defendant Picerno called his wife, Joyce Picerno, and asked her to contact attorneys John and Tom DeSimone.
Mrs. Picerno could not immediately reach the DeSimones but continued trying. Defendant Picerno awaited a return call from his wife or the DeSimones. Although defendant Picerno did not refuse to cooperate further with the State Police, he continued to express trepidation about recording a statement and "signing on" for his cooperation with the sting operation until he had an attorney's "blessing on the deal." Defendant Picerno expressed that he wanted to "keep his options open" regarding a deal; he neither requested to have an attorney present for continued discussions or questioning nor asserted his right to remain silent. Assistant Attorney General Ferland told defendant Picerno he needed to trust that the State would maintain its end of the bargain.
Just prior to 6:00 p.m., defendant Picerno received a return telephone call from Oster on his cellular phone. Either just before or while answering the phone, defendant Picerno told the detectives that he wanted to "keep his options open." Defendant Picerno spoke briefly with Oster and set up a meeting with him for the following morning.
Immediately following his conversation with Oster, defendant Picerno called his wife a second time to check on the status of her locating the DeSimones. He also asked her not to call anyone else or spread word of his arrest. The State Police had learned — through a wiretap of the Picerno residence telephone that was earlier obtained as part of the bribery and corruption investigation — that Mrs. Picerno was telling a number of third parties about defendant Picerno's arrest. The detectives informed defendant Picerno of this fact and told him that his arrest must be kept secret for him to benefit from cooperation. The detectives thought that a sting operation could not succeed if subjects of the investigation learned of defendant Picerno's arrest and suspected his status as a cooperating witness. Defendant Picerno understood that his ability to cooperate (which he desired to do) hinged on keeping his arrest secret.
While defendant Picerno continued to wait to hear from attorneys John and Tom DeSimone, he called his wife a third time to check on the status of her locating counsel. Knowing that defendant Picerno wanted to cooperate, the detectives asked defendant Picerno to tell his wife to keep the arrest confidential. Defendant Picerno so instructed his wife.
 D. Search of Picerno Residence
In the meantime, at approximately 6:15 p.m., Inspector Elwood Johnson and two other State Police detectives arrived at the Picerno residence in North Providence, Rhode Island Defendant Picerno's wife, Joyce Picerno, answered the door. The detectives identified themselves and said they would like to speak with her. She invited them inside. Inspector Johnson explained that the State Police had arrested defendant Picerno and that he had admitted to hiding $15,000.00 in bribe money in his home. Inspector Johnson told her that he was aware that defendant Picerno had called her about hiring counsel to assist him in cooperating and that her husband had told her not to talk to others about his arrest. The detectives then asked for permission to search the home; but Mrs. Picerno wanted time to think about it. The detectives waited in the parlor for forty minutes while Mrs. Picerno made and received approximately twenty telephone calls. Inspector Johnson could hear part of the conversations and understood that she was trying to reach attorney John DeSimone. At one point, Mrs. Picerno had Inspector Johnson speak with an attorney, who was a relative of John DeSimone, to explain what was happening.
While they were waiting, the detectives told Joyce Picerno that, if she did not consent to the search, then they could obtain a search warrant from a judge. Mrs. Picerno eventually consented to the search. Just before agreeing to allow the search, Mrs. Picerno posed a hypothetical question to the effect of: "Let's say I let you search, could I see my husband after that happens?" Inspector Johnson responded, "absolutely, of course you can see your husband" Mrs. Picerno then consented to the search. At 7:10 p.m., Joyce Picerno executed a "Consent to Search" form, whereby she acknowledged her consent to the search in writing. Joyce Picerno and each of the three detectives who were present in the home affixed their signatures to the consent form. The detectives also videotaped Mrs. Picerno holding the executed form.
The detectives informed Joyce Picerno that the search would be easier if she assisted them. She accompanied the detectives on part of the search, but denied any knowledge of the money or its location. The detectives did not immediately locate the money. At about 7:45 p.m., Lieutenant Bannon called the residence and informed Inspector Johnson that the money was divided between the freezer and the dresser. Defendant Picerno had told Lieutenant Bannon the location of the cash because he knew from overhearing Lieutenant Bannon's conversation with Inspector Johnson that the detectives could not locate the money during the search. Defendant Picerno acknowledged at the suppression hearing that he may have volunteered that information. Defendant Picerno and his wife then spoke briefly on the telephone. Defendant Picerno told his wife the exact location of the cash and instructed her to give it to the detectives. The detectives then located $10,000.00 in cash wrapped in foil in the freezer. At 7:57 p.m., the detectives located $5,000.00 in cash hidden in a panty shields' box inside the bedroom dresser. The detectives videotaped their locating of the cash. Defendant Picerno admitted at the hearing that he had cooperated in helping the State Police locate the money.
The detectives discontinued their search after seizing the $15,000.00. Shortly thereafter, the detectives left the Picerno residence to return to State Police headquarters. Mrs. Picerno followed the detectives to the station in her own vehicle.
 E. The Evening: Quest for Another Attorney
Meanwhile, at State Police headquarters, defendant Picerno continued to wait to hear from attorneys John and Tom DeSimone. Among those present with defendant Picerno, at varying intervals, were Detectives Casilli and Lemont, Major Brendan P. Doherty, and Assistant Attorney General Ferland The parties engaged in "casual conversation," "talked sports," and ate pizza. Although the State Police did not interrogate defendant Picerno during this time period, their discussion with him "touched on aspects of the investigation." Defendant Picerno would segue back to the investigation, express his interest in cooperating, and ask how he could help himself.
At approximately 8:00 p.m., Major Doherty told defendant Picerno that his "window of opportunity" to cooperate was closing. Knowing Mrs. Picerno had told third parties about defendant Picerno's arrest, Major Doherty and the other investigators were concerned that news would spread about the arrest and that any potential sting operation would fail if they did not act by the following morning. Major Doherty suggested to defendant Picerno that if he were interested in cooperating, he needed to find another attorney so they could proceed, finalize the deal, and conduct the sting operation, as scheduled, in the morning.
Defendant Picerno agreed to seek another attorney. The detectives provided him with the phonebook. Wanting some suggestions, defendant Picerno asked if the detectives could recommend a reputable criminal defense attorney. Major Doherty asked Assistant Attorney General Ferland if he could respond to defendant Picerno's request. Assistant Attorney General Ferland told Major Doherty not to pick an attorney for defendant Picerno but to list some attorneys from the yellow pages for defendant Picerno to consider. Defendant Picerno and the investigators agreed that it would be best to avoid attorneys from the Lincoln area due to their potential criminal involvement with the case.
The detectives perused the yellow pages, listing the names of attorneys of whom they had knowledge, while providing commentary as to their experience and reputation. Defendant Picerno recognized the names of attorneys Joel Chase and David Revens. Major Doherty called both attorneys but eventually reached attorney Revens first. Major Doherty briefly explained the situation to attorney Revens and then let defendant Picerno speak to Mr. Revens privately.
Next, Mrs. Picerno arrived at State Police headquarters and met with her husband Shortly thereafter, at approximately 9:00 p.m., attorney David Revens arrived.[7] Major Doherty explained the situation to Mr. Revens and then introduced him to defendant Picerno. Defendant Picerno and his wife met with attorney Revens in a private conference room for a couple of hours, after which Mr. Revens emerged and informed the State Police that defendant Picerno would cooperate with the sting operation the next morning and thereafter provide a written statement to the police.
 F. The Following Morning: Sting Operation
Defendant Picerno then spent the night in a jail cell at State Police headquarters. Detective Lemont greeted defendant Picerno with breakfast the following morning, February 16, 2002. A team of detectives then prepared defendant Picerno for the sting operation. They briefed defendant Picerno regarding his task and had him don a recording device. The plan was for defendant Picerno to meet Jonathan Oster at his law office at 10:00 a.m. and pass Oster an envelope containing $10,000.00 in cash. The State Police initially planned on having defendant Picerno deliver $15,000.00 to Oster but later changed the amount to $10,000.00 upon defendant Picerno's suggestion that it would be a more realistic amount.
Defendant Picerno voluntarily participated in the sting operation. He first drove himself to Oster's office. The detectives followed in separate vehicles. Defendant Picerno then briefly met with Oster and passed him the envelope containing the $10,000.00 in cash. The police maintained audio, video, and visual surveillance of the encounter. Next, defendant Picerno reconvened with the detectives at a prearranged location. The State Police kept defendant Picerno in custody throughout the afternoon and then transported him to the Wickford State Police Barracks to give a formal, recorded statement.
 G. Defendant's Recorded Statement and Continued Cooperation
On February 16, 2002, at 4:00 p.m., Lieutenant Bannon facilitated the taking of a formal statement from defendant Picerno. Defendant Picerno acknowledged at the suppression hearing, albeit reluctantly, that he gave the statement voluntarily. Also present for the statement were Detective Stacy Sheppard and attorney David Revens. Lieutenant Bannon advised defendant Picerno of his Miranda rights, using a standard rights form. Defendant Picerno indicated that he understood his rights and then signed the form to acknowledge his knowing and voluntary waiver of those rights. His attorney also signed the form.
Defendant Picerno, with his counsel present, then provided a statement to Lieutenant Bannon. The statement took the form of a recorded interview, consisting primarily of leading questions, which called for yes, no, or short answers, as opposed to open-ended questions that called for narrative responses.[8] At 4:40 p.m., defendant Picerno spoke privately with his attorney and then continued the interview. The interview concluded at 4:46 p.m. A Justice of the Peace subsequently set bail and the State Police released defendant Picerno from custody. On at least a few occasions throughout May, June, and July, 2002, defendant Picerno — with the assistance of his current defense counsel, attorney Stephen Famiglietti — continued to cooperate with the State Police.
 II. DEFENDANT PICERNO'S MOTION TO SUPPRESS STATEMENTS A. Discerning Defendant Picerno's Argument
Defendant Picerno moves to suppress all of the statements he made from the time period following his arrest on February 15, 2002 at 1:30 p.m. through the conclusion of his recorded statement in the early evening of February 16, 2002. More specifically, defendant Picerno seeks to suppress: (1) the statements he made to Detectives Casilli and Lemont during the afternoon interrogation of February 15, 2002; (2) the statements he made to other members of the State Police and the Department of Attorney General throughout February 15, 2002 and February 16, 2002; (3) the statements he made on February 15, 2002 in an effort to arrange a meeting with Jonathan Oster for the next morning; (4) the statements he made on February 15, 2002 referring to the location of money or other contraband at his residence; (5) the statements he made on February 16, 2002 in connection with his meeting with Jonathan Oster; and (6) the recorded statement he made during the afternoon of February 16, 2002. Defendant Picerno argues:
 [a]lthough there are particular aspects of the State's conduct which in and of themselves compel suppression of incriminating statements made by Defendant at various points of this custodial episode, the primary basis of Defendant's argument is one of lack of `voluntariness' at the outset and throughout the entire duration of his custody. Accordingly, each of these arguable individual constitutional violations serve as significant factors in the totality of circumstances that this Court must analyze in determining whether any of Defendant's statements were [truly voluntary]. . . .
Defendant's Memorandum in Support of Motion to Suppress at 3. In short, defendant Picerno argues that the totality of the circumstances render his statements involuntary, thus violating his privilege against coerced self-incrimination.
As noted above, defendant Picerno challenges the admissibility of his statements based on an alleged lack of voluntariness. His motion does not expressly challenge the admissibility of his statements on the basis of an alleged Miranda violation. Although not obliged to raise defendant Picerno's arguments for him, this Court will so aid defendant Picerno and consider whether he waived his Miranda rights before making the statements.[9] See State v. Apalakis, 797 A.2d 440, 447 n. 4 (R.I. 2002) (considering only voluntariness and refraining from addressing whether defendant's Miranda rights were violated because defendant made no such challenge). Although closely related and easily merged, the two issues — voluntariness of the confession and knowing and intelligent waiver of Miranda
rights — are distinct.[10] State v. Griffith,612 A.2d 21, 26 (R.I. 1992); State v. Amado, 424 A.2d 1057, 1062 (R.I. 1981). Defendant Picerno at least impliedly raises an argument that his Miranda rights were violated by moving to reopen the suppression hearing to challenge the authenticity of defendant Picerno's initials on the rights waiver form.
Defendant Picerno also briefly raises a right to counsel argument, citing the Sixth Amendment, alleging not only a deprivation of his right to counsel but a violation of his right to the counsel of his choice. Defendant Picerno advances this Sixth Amendment right to counsel argument as part of his claim that the police violated his Fifth Amendment right to have an attorney present during a custodial interrogation. See Statev. Fuentes, 433 A.2d 184, 190 (R.I. 1981) (distinguishing between Fifth Amendment right to counsel and Sixth Amendment right to counsel).
It is clear, however, that at the time of the interrogation in question, "no formal adversarial proceedings had been initiated against [defendant Picerno], thus, there could have been no violation of [defendant Picerno's] Sixth Amendment right to counsel at the time in question." Id.; see also McNeil v.Wisconsin, 501 U.S. 171, 175-76, 111 S.Ct. 2204, 2207-08, 115 L.Ed.2d 158, 166-67 (1991) (Sixth Amendment right to counsel cannot be invoked until after a prosecution is commenced by way of formal charge, preliminary hearing, indictment, information, or arraignment); State v. Baton, 488 A.2d 696, 703 (R.I. 1985) (same). This Court thus will focus solely on defendant Picerno's "prophylactic" right to counsel pursuant to the Fifth Amendment's protection against self-incrimination. See Fuentes, 433 A.2d at 190; McNeil, 501 U.S. at 175-76, 111 S.Ct. at 2207-08, 115 L.Ed.2d at 166-67.
 B. Waiver of Miranda Rights
Both the state and federal constitutions provide a right against self-incrimination.[11] U.S. Const. amend. V.; R.I. Const. art. I, § 13; see also State v. Bertram,591 A.2d 14, 21 (R.I. 1991) (discussing state and federal right against self-incrimination). Such constitutional rights prohibit the "use in a criminal trial of a defendant's involuntary statements."State v. Apalakis, 797 A.2d 440, 446 (R.I. 2002) (quoting cases); State v. Marini, 638 A.2d 507, 510 (R.I. 1994). In addition to proving that a defendant gave his or her statements voluntarily, when the statement is obtained through a custodial interrogation, the State also must prove that the defendant knowingly, intelligently, and voluntarily waived the constitutional rights expressed in Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before giving the statement. State v. Apalakis, 797 A.2d 440, 447 n. 4 (R.I. 2002). The Court first will address the waiver-of-Miranda
issues presented by this case and then address the voluntariness of defendant Picerno's statements, along with the Fifth Amendment right to counsel issues.
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that prior to a custodial interrogation, an accused must receive explicit warnings concerning his or her constitutional privilege against self-incrimination and right to counsel. State v.Amado, 424 A.2d 1057, 1061 (R.I. 1981). If an interview of the suspect thereafter ensues without the presence of an attorney, the State bears the burden of proving, by clear and convincing evidence, that the suspect voluntarily, knowingly, and intelligently waived his or her rights. State v. Benton,413 A.2d 104, 109 (R.I. 1980).
The trial justice determines whether there has been a valid waiver using a "totality-of-the-circumstances approach." Statev. Amado, 424 A.2d at 1061 (quoting Fare v. Michael C.,442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979)). The trial justice may find that the suspect waived his or her privilege against self-incrimination without proof of an express waiver, if such waiver can clearly be "inferred from the actions and words of the person interrogated." State v. Amado,
424 A.2d at 1061 (quoting North Carolina v. Butler,441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292 (1979)). There is no per se rule; rather, the Court looks to the "particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." North Carolina v. Butler, 441 U.S. 369, 374-75, 99 So. Ct. 1755, 1758, 60 L.Ed.2d 286, 293 (1979); State v.Griffith, 612 A.2d 21, 26 (R.I. 1992). This evaluation also should include an inquiry into the age, education, and intelligence of the accused. State v. Benton, 413 A.2d at 109 n. 1.
 1. Credible Evidence of Waiver
In the instant case, the Court finds that, before defendant Picerno made any statements, the State Police satisfactorily informed him of his Miranda rights and he thereafter knowingly, intelligently, and voluntarily waived those rights. Based on all of the credible evidence adduced at the suppression hearing and the totality of the circumstances, this Court is satisfied that the State proved such a waiver by clear and convincing evidence.
Immediately following his arrest, detectives twice verbally informed defendant Picerno of his Miranda rights and each time defendant Picerno indicated his understanding of those rights. Before the detectives initiated any discussions with or interrogation of defendant Picerno in the afternoon, they again apprised defendant Picerno of his Miranda rights with a standard rights form. Detective Casilli read the rights off of that form to defendant Picerno. As Detectives Casilli and Lemont testified, defendant Picerno then read the rights form, initialed next to each of its paragraphs, and signed the bottom of the form.[12] In executing the rights form, defendant Picerno acknowledged his understanding of his Miranda rights and expressed that he wished to make a statement, waive his right to remain silent, and waive his right to counsel.
In a vain attempt to refute this evidence of waiver, defendant Picerno stated, during the course of his direct examination, that he did not recall initialing next to the paragraphs numbered "7" and "8" on the rights form — paragraphs that would indicate that defendant Picerno understood his rights, agreed to make a statement and did not seek to invoke his right to counsel.[13] Although his counsel attempted vigorously to prod defendant Picerno to state unequivocally that he did not initial paragraphs "7" and "8" of the rights form, the most that defendant Picerno would say is that he is "pretty sure" he did not make the initials. Upon this slender reed, defendant sought to support his argument that he did not waive his Miranda
rights or thereafter make any voluntary statements.
Yet defendant Picerno's testimony in this regard was simply incredible. Given his demeanor, his reluctance to deny initialing the questioned paragraphs, his admission that he signed the form and the credible contrary testimony of Detectives Casilli and Lemont, this Court simply does not accept defendant Picerno's testimony regarding the initialing of the latter two paragraphs of the rights form. As he freely acknowledged on direct examination, defendant Picerno examined the rights form with his counsel in preparation for the suppression hearing and thereafter sought to highlight certain self-proclaimed disparities between the initials next to paragraphs 7 and 8 and the initials next to the remainder of the paragraphs that he admitted were his own. He desperately wanted the rights form to prove that he did not initial the last two paragraphs of the rights form that, if initialed, would signify his willingness to speak to the police and a waiver of his right to counsel. Yet the rights form itself cannot prove that which he could not prove directly through his own testimony. Indeed, in this Court's view, there is nothing about the way that form is initialed, albeit reflecting differences in all of the initials and more of an "x" type character to the second letter of the latter two initials, that undermines the credible direct testimony of the officers who witnessed defendant Picerno initial all of its paragraphs or that makes the equivocal testimony of defendant Picerno about initialing less equivocal.
Moreover, this Court is convinced that in signing the rights form, regardless of the initialing process, defendant Picerno intended to knowingly, intelligently and voluntarily waive all of the rights contained therein and to agree to speak with the State Police without counsel. Significantly, defendant Picerno's actions following the execution of the rights form are inconsistent with his testimony and consistent with a waiver.See State v. Amado, 424 A.2d at 1061, supra, and NorthCarolina v. Butler, 441 U.S. at 374-75, supra (waiver may be inferred from defendant's actions and conduct).[14]
Defendant Picerno, for example, did not invoke his right to counsel in connection with making any statements to the police,see section D. infra, and undertook a host of cooperative actions to assist the police in their investigation.[15]
In addition, defendant Picerno's background and experience support this Court's conclusion of waiver. See State v.Griffith, 612 A.2d at 26, supra (background and experience of accused may be a factor in determining waiver). Defendant Picerno testified that he understood his rights. While testifying, he proved to be articulate, intelligent, and clever. Defendant Picerno is a middle-aged man and has been a government official for the Town of Lincoln. Defendant Picerno also testified that his arrest in this case was not the first time that he had made statements to and cooperated with the police; defendant Picerno admitted cooperating with the police in the late 1970's in exchange for some type of deal with the State. Moreover, credible evidence offered at the hearing established that defendant Picerno's decision to speak to the police was free, rational, calculated to assist him through cooperation, and not otherwise influenced by overt or subtle police coercion of any kind. The Court accepts the testimony provided by a number of detectives evidencing that the State Police never subjected defendant Picerno to physical force, threats, or promises and that he was neither physically restrained nor confronted by an overwhelming number of authorities.
Accordingly, this Court finds that defendant Picerno clearly was apprised of his constitutional rights; understood his constitutional rights; knowingly, intelligently, and voluntarily waived his rights; and fully executed the rights waiver form indicating the same. As discussed below, the Court's decision in this regard is unaffected by the evidence introduced at the reopened evidentiary hearing, as it assigns no weight to the expert testimony presented by the defense and finds nothing in the expert testimony presented by the State that changes its view of the witnesses and the evidence that it had prior to the reopened hearing.
 2. Reopened Evidentiary Hearing
Perhaps sensing these vulnerabilities in his claim of involuntary waiver following the conclusion of the suppression hearing, defendant Picerno made a desperate, eleventh-hour attempt to bolster his testimony (wholly contradicted by Detectives Casilli and Lemont in their testimony) that he was "pretty sure" that he did not initial the paragraphs numbered "7" and "8" on the rights form (collectively referred to as the "questioned initials"). Defendant Picerno did not dispute initialing the other paragraphs numbered "1" through "6" on the rights form (collectively referred to as the "known initials"). On the eve of issuing its decision on defendant Picerno's motion to suppress, the Court received a motion from defendant Picerno by which he asked the Court to postpone issuance of that decision. Defendant Picerno sought time to further consult with a handwriting examiner in the hope of securing expert opinion testimony that would corroborate his own testimony, contradict the testimony of the State Police and support a request to reopen the suppression hearing. The Court granted the motion to postpone its decision, with no objection by the State.
After defendant Picerno succeeded in finding a handwriting expert to buttress his case, he then filed a motion to reopen the evidentiary hearing. Defendant Picerno attached to this motion the report of a document examiner, Pauline Patches. In her report, Ms. Patchis rendered a "preliminary opinion" that the questioned initials on the rights form were not, in all probability, written by the same person who authored the known initials. Receiving no objection from the State,[16] this Court granted defendant Picerno's motion to reopen the suppression hearing. For reasons unknown, Ms. Patchis would not testify at the hearing, although her report — Exhibit B to defendant Picerno's motion to reopen the hearing — expressly stated that she was "prepared to present actual findings in a court of law. . . ." Defendant Picerno then retained another document examiner, Charles Shure, to give similar expert opinion testimony at the hearing regarding the authorship of the questioned initials.[17]
The Court conducted the reopened evidentiary hearing on January 12 and 13, 2003. Mr. Shure testified on defendant Picerno's behalf, and the State called its own expert witness, John Breslin, in rebuttal. Mr. Shure opined that the questioned initials were not those of the individual who authored the known initials (defendant Picerno). In contrast, Mr. Breslin opined that he could not reach a conclusive opinion that would either identify or eliminate the author of the known initials as the author of the questioned initials.
Rule 702 of the Rhode Island Rules of Evidence addresses testimony by experts. Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." This Court has wide discretion in applying this rule. State v. Griffin, 691 A.2d 556, 558 (R.I. 1997) (trial justice has wide discretion in connection with admission of expert testimony); State v. Morales,621 A.2d 1247, 1249 (R.I. 1993) (application of Rule 702 resides with trial justice and decision will not be disturbed absent abuse of discretion).
Rule 702 generally raises two questions for the trial court to determine before it permits the fact-finder to consider expert opinion: (1) "whether a proferred expert is qualified to testify on a particular subject," State v. Rodriguez, 798 A.2d 435, 438 (R.I. 2002); and (2) if so, is such testimony "based on ostensibly reliable scientific reasoning and methodology." Owensv. Silvia, No. 2002-218, 2003 LEXIS 235, at *15 (R.I. Dec. 22, 2003). As to whether the proposed expert is qualified to testify, the "controlling inquiry is whether the proffered expert is qualified by virtue of his or her `knowledge, skill, experience, training, or education' to deliver a helpful opinion to the jury." State v. Morales, 621 A.2d 1247, 1249 (R.I. 1993). This determination "rests within the sound discretion of the trial justice." Rodriguez, 798 A.2d at 438.
Regarding the issue of scientific reasoning and methodology, if such testimony is "novel or highly complex scientific or technical," the trial justice must "control the gateway" and admit the testimony only if the "expert proposes to testify `to (1) scientific knowledge that (2) will assist the trier of fact.'" Owens, supra at *15. The most critical consideration is helpfulness to the trier of fact. Id. The latter inquiry requires the Court to evaluate the relevance of the testimony in determining a fact in evidence; it must be "sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute." Id. at *15-16 n. 3. The former part of the test is often referred to as the "reliability test" and seeks to ensure scientific validity. Id. at *16-17. When the science is novel or complex, four non-exclusive factors are helpful in determining scientific validity. Those factors are:
 (1) whether the proffered knowledge has been or can be tested; (2) whether the theory or technique has been the subject of peer review and publication; (3) whether there is a known or potential rate of error; and (4) whether the theory or technique has gained general acceptance in the scientific community.
Id. at *17. The expert's qualifications also may be considered in determining reliability. Id. Simply put, the proponent of the evidence needs to show that "the expert arrived at his or her conclusion in what appears to be a scientifically sound and methodologically reliable manner." Id. at 18. If the trial justice finds that the proffered expert evidence possesses apparent reliability, he or she should submit the "testimony to the trier of fact to determine how much weight to accord such evidence." Id.
In this case, the State initially challenged the qualification of the defendant's expert, Charles Shure, to proffer opinion testimony as an "expert document examiner" regarding the initialing of the rights form. The State conducted a voir dire examination of Mr. Shure to support its qualification objection. The State argued that the defense failed to establish Mr. Shure's expert qualifications because: (1) there was no evidence that he received adequate training (in part because there was no evidence regarding the credentials of the "expert" under whom he claimed to have apprenticed); (2) he is not a member of the American Board of Forensic Document Examiners (the "ABFDE") (the organization for the accreditation of qualified forensic document examiners) and has not apprenticed under a member of that organization; and (3) there was no evidence that his analysis had been subjected to peer review.
The State relied on Wolf v. Ramsey, 253 F. Supp.2d 1323
(N.D.Ga. 2003) in support of its opposition to the court qualification of Mr. Shure. In that case, the federal district court held that an individual who had ten years of experience in the field of document examination and was a member of the National Association of Document Examiners ("NADE") — almost identical credentials to those possessed by Mr. Shure — was not qualified to provide reliable handwriting analysis in the case because she had not taken a certification examination, completed an accredited course in document examination, or served as a member of or apprenticed under a member of the ABFDE (which the Court found to be the sole recognized organization for the accreditation of forensic document examiners).
This Court did not declare Mr. Shure to be a qualified document examiner, as the defense had requested. It nonetheless allowed the defense to elicit opinion testimony from this witness at the hearing. Similarly, when the State sought to present the testimony of Mr. Breslin in rebuttal (which elicited an unsubstantiated defense challenge to his qualifications triggered solely by the fact that the State has deigned to challenge the defense expert), this Court likewise did not declare him to be a qualified expert in the field of questioned documents, as the State had requested. It nonetheless allowed the State to elicit opinion testimony from its witness.
In allowing this testimony to be presented by both of the parties, this Court was mindful of the fact that the policy rationale underlying Rule 702 that allows for the Court, as gatekeeper, to exclude the opinion testimony of unqualified experts is geared toward the trial by jury. In a pre-trial evidentiary hearing before the Court as trier of fact, such as the suppression hearing at issue here, there is no present risk, inherent in a trial by jury, that laypersons will assign undue weight to the opinion testimony of a witness who may be unqualified or who may give unreliable scientific opinion testimony. As such, this Court allowed the defense to present the opinion testimony of Mr. Shure and the State to present the opinion testimony of Mr. Breslin, confident that it could consider the presence or absence of their qualifications and the reliability or unreliability of their scientific reasoning or methodology in assigning appropriate weight to their testimony.[18] As the fact-finder deciding defendant Picerno's motion to suppress, the Court is "always free to accept, to reject, or to accord any amount of weight it chooses to the expert's testimony." State v. Rieger, 763 A.2d 997, 1004 (2001); see also State v. Morales, 621 A.2d 1247, 1249 (R.I. 1993) (trier of fact determines weight to be accorded expert testimony).
After due consideration of the evidence presented at the reopened suppression hearing, this Court assigns no weight to the expert testimony of Mr. Shure. As an initial propostion, this witness' lack of essential qualifications as a document examiner undermined his credibility and the reliability of his opinion testimony.
Mr. Shure is not a member of the ABDFE nor did he ever train under or become certified by a member of that Board — an organization identified by at least one court as the "sole recognized organization for the accreditation of forensic document examiners." Wolf v. Ramsey, 253 F. Supp.2d at 1345,supra. Instead, he belongs to the NADE — an organization that Mr. Shure was able to join simply by paying a fee that does not require the training or certification of its members. Although he advertises himself as a certified document examiner, he obtained "certification" not through a process by which his analysis was tested or subjected to peer review, but by serving as an apprentice to an individual whose credentials remain a mystery to this Court.
Even though he also holds himself out as a "qualified" document examiner — a fact that he unconvincingly tried to deny by saying that the term "QDE" on his resume meant "questioned" document examiner as opposed to "qualified" document examiner — he admitted that his qualifications are rooted not in his education, training and experience but in his having been qualified by 56 courts in the past to give expert opinion testimony. Yet the fact of such past qualification does not establish him as a witness qualified to give reliable expert opinion testimony in this case. This Court has no way of knowing the nature of the cases in which he gave expert testimony, whether there was any challenge to his expert qualifications in the cases, whether the courts in those cases were asked to qualify him and whether that testimony ultimately was accepted. He acknowledged that he only has testified about initials in court on one prior occasion. More importantly, he was unwilling to provide this Court with the specific information that it requested from him about that case and the two past Rhode Island cases in which he claimed to have been qualified as an expert. In the single reported case that this Court unearthered where Mr. Shure offered his expert opinions, he did so by joining with Ms. Patchis in the filing of "preliminary" expert reports in support of a post-trial motion; neither he nor she were qualified by the Court as expert witnesses (as there was no evidentiary hearing) nor were his opinions ultimately accepted by the Court. See Tiller v.Baghdady, 294 F.3d 277, 282-84 (1st Cir. 2002). Query whether that case was one of the 56 cases in which Mr. Shure testified that he had been qualified as an expert witness in the past.
In addition, this Court questions whether Mr. Shure arrived at his conclusions in a "scientifically sound and methodologically reliable manner." Owens, supra at *15. Although there is generally widespread authority for admitting expert testimony on handwriting comparison, see, e.g., United States v. Crisp,324 F.3d 261, 270-71 (4th Cir. 2003); United States v. Mooney,315 F.3d 54, 62-63 (1st Cir. 2002); United States v. Jolivet,224 F.3d 902, 905-06 (8th Cir. 2000); United States v. Paul,175 F.3d 906, 909-11 (11th Cir. 1999); United States v. Jones,107 F.3d 1147, 1156-60 (6th Cir. 1997); United States v.Velasquez, 64 F.3d 844, 848-50 (3d Cir. 1995); State v.Griffin, 691 A.2d 556 (R.I. 1997), reliability questions nevertheless persist. At least a few courts recently have excluded such expert testimony due to scientific and methodological unreliability. See, e.g., United States v.Saelee, 162 F. Supp.2d 1097 (D. Alaska 2001); United States v.Lewis, 220 F. Supp.2d 548, 550-54 (S.D.W.Va. 2003); UnitedStates v. Brewer, No. 01-CR-892, 2002 U.S. Dist. LEXIS 6689 (N.D.Ill. April 12, 2002). The skepticism about such expertise is well-founded given the extent to which it has not been subject to testing, publication or peer review and its potentially high rate of error. See generally D. Michael Risinger et al., Exorcismof Ignorance as a Proxy for Rational Knowledge: The Lessons ofHandwriting Identification "Expertise," 137 U. Pa. L. Rev. 731 (1989). It does not take an expert to know that a given person's handwriting can vary greatly, be subject to mood, environmental conditions and the passage of time, and be consciously altered or disguised.
The expert testimony of Mr. Shure in the present case is arguably even more susceptible to the "unsupported speculation" Rule 702 seeks to check. See Owens, supra at *19. Testimony from both experts indicated that determining the authorship of initials is inherently more problematic than most cases of handwriting comparison. As opposed to normal handwriting, initials often vary more, even on a given day; initials usually consist of fewer letters for analysis; and initials are rarely used, thus often limiting the number, if any, of historical or contemporaneous writings available for comparison. There is no evidence that there is an accepted reliable scientific methodology for determining the authorship of initials, that the methodology employed by Mr. Shure in analyzing the questioned initials in this case has been accepted in the field, subjected to peer review or testing, or can be employed without a significant risk of error.
Moreover, even assuming that the methodology employed by Mr. Shure could be utilized, at least theoretically, to reach a reliable scientific result in determining the authorship of initials, the testimony of Mr. Breslin makes it clear that Mr. Shure lacked the essential information to reach a credible and reliable scientific result. According to Mr. Breslin, proper forensic document analysis requires consistency through known writings. As both experts admitted, there is little consistency among defendant's known initials on the rights form, as well as between those initials and the exemplars he later provided. While Mr. Shure intimated that could be due to the defendant's confinement at the time of the initialing under adverse conditions, there was no evidence presented to explain the exact conditions under which defendant Picerno initialed the rights form. Besides, Mr. Shure acknowledged that he had no expertise to make that conclusion. Ironically, if such adverse conditions could cause those discrepancies, they arguably could cause any differences in the initials on the rights form itself.
Given the problems inherent in analyzing initials, the inconsistencies in the known writings and between those writings and the exemplars, and the absence of sufficient samples of known initials for comparison (only two questioned initials and six known initials), this Court believes it was imperative for the experts to obtain contemporaneous historical writings. Both experts acknowledged as much in their testimony. Yet defendant Picerno made no such writings available to either expert or to the Court and never explained why he failed to do so.[19]
Mr. Breslin candidly commented that these problems prevented him from reaching a conclusive opinion as to whether the author of the known initials also authored the questioned initials. But Mr. Shure simply ignored the inconsistencies among the known initials, and between those known initials and the exemplars, as well as the absence of historical writings so as to be able to give an opinion that the questioned initials were not authored by the author of the known initials (defendant Picerno). His testimony in this regard offered no helpful science and brought to mind the lable of a "charlatan or purveyor of junk science."Gallucci v. Humbyrd, 709 A.2d 1059, 1064 (R.I. 1998).
In offering that opinion, Mr. Shure lost all credibility with this Court. While Mr. Shure was sure to parrot certain buzz-words regarding the conclusiveness of his opinions, namely that his opinions were "to a reasonable degree of scientific certainty," this Court simply did not believe him. This Court found it disingenuous, on the one hand, for Mr. Shure to conclude to a reasonable degree of scientific certainty that someone other than defendant Picerno authored the questioned initials, while on the other hand admitting that: (1) it is unusual for a handwriting and document analyst to examine initials exclusively; (2) initials are a "strange enigmatic area"; (3) initials pose unique problems because they often vary and consist of a limited number of letters; and (4) few likenesses exist between defendant Picerno's known initials on the form and the exemplar initials, which could be the result of disguise.
Mr. Shure's credence further eroded when his bias toward the defendant was made manifest. He knew the results his client wanted before examining the questioned document;[20] his fee arrangement ensured a financial windfall if his conclusion favored defendant Picerno;[21] and he acknowledged that he "may have" been told of Patchis' conclusion (which she never subjected to cross-examination in court) before rendering his own.
Without a credible opinion from Mr. Shure as to authorship and with an inconclusive opinion about authorship by Mr. Breslin, this Court was deprived of any scientific testimony that could assist it in further addressing the question defendant Picerno tried to raise concerning the initials. All that remained of the experts' testimony was their musings about the physical similarities and dissimilarities between the known and questioned writings — comparisons that the Court had done already, even prior to the reopened suppression hearing, without them. Neither of the experts' pedestrian comparisons in this regard was at all helpful to the Court.
Absent any assistance from the expert witnesses, this Court simply returns to its earlier view of the evidence surrounding execution of the rights form. See section B. 1., supra
(detailing evidence of waiver). Nothing about the initialing of the rights form itself changes this Court's view of evidence. There remains clear and convincing evidence that defendant Picerno knowingly, intelligently and voluntarily waived hisMiranda rights.
 C. Voluntariness of Defendant Picerno's Statements 1. Voluntariness: In General
The Court next addresses defendant Picerno's argument that his statements were not voluntary. As briefly mentioned above, it is axiomatic that a defendant's involuntary statements may not be used against him in a criminal trial. State v. Marini,638 A.2d 507, 510 (R.I. 1994).
It is well settled that
 [t]o determine whether a statement was voluntary, this Court looks to the totality of the circumstances. If, in light of all the facts and circumstances, a statement was the product of a defendant's free and rational choice, the statement was voluntary. If, however, the statement was the result of coercion that had overcome the defendant's will at the time he confessed, the statement must be suppressed. . . . [T]he state must furnish clear and convincing evidence of [the statement's] voluntariness.
State v. Apalakis, 797 A.2d at 447 (internal quotes and citations omitted). All facts and circumstances must be considered "in determining whether, overall, the confession was freely and voluntarily made," State v. Marini, 638 A.2d 507, 512 (R.I. 1994), including the behavior of the defendant and the behavior of the interrogators. State v. Girard, 799 A.2d at 250. The issue of voluntariness often depends on whose testimony the court finds credible. Id.
For many of the reasons discussed above regarding defendant Picerno's waiver of Miranda rights, the Court also finds that the State has shown by clear and convincing evidence that defendant Picerno freely and voluntarily made all of the statements in question. The Court will not reiterate at length the above-discussed rationale as it would serve this Court "no other end than to hear its own words resonate." Maurice v. StateFarm Mut. Auto. Ins. Co., 235 F.3d 7, 10 (1st Cir. 2000). Rather, adopting the Rhode Island Supreme Court's philosophy inState v. Griffin, 691 A.2d 556, 557-58 (R.I. 1997), the Court "[w]eild[s] Ockham's razor," avoids surplusage, and "cut[s]to the heart" of the issues with only a brief restatement of the above bases.[22] See id.
Seemingly, defendant Picerno may have a valid argument if a finding of voluntariness required the Court to find that defendant Picerno actively "wanted to confess or that his confession was `completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist.'"[23] State v.Marini, 638 A.2d at 512 (quoting Miller v. Fenton,796 F.2d 598, 605 (3d Cir. 1986). This notion of voluntarianess, however, is not the standard. A "statement is voluntary when it is the product of [the defendant's] free and rational choice." Id.
Conversely, "a confession extracted by coercion or improper inducement, including threats, violence, direct or indirect promises, or undue influence, is considered involuntary." Id.
Based on credible testimony, this Court finds that the defendant voluntarily cooperated and voluntarily provided all statements to the police. As discussed above, the Court found that defendant Picerno was never subjected to physical force, threats, or promises. Defendant Picerno was neither physically restrained nor confronted by an overwhelming number of authorities. Throughout defendant Picerno's custodial interrogation, defendant Picerno had access to a telephone, refreshments, and never indicated he wanted to stop cooperating.
 2. Voluntariness: Specific Arguments
Perhaps mindful of his weak deprivation of counsel argument,see infra, defendant Picerno grasps desperately at specific factors that he claims aggregate to show that his statements were involuntary under a totality of the circumstances test. Defendant Picerno first asserts that the authorities threatened to prosecute his wife and son if he did not cooperate. The Court rejects this proposition. Based on the credible evidence, the Court finds that defendant Picerno and the State amicably agreed that in exchange for defendant Picerno's cooperation, the State would forego prosecuting defendant Picerno's wife and son with regard to unrelated potential criminal activity.
Defendant Picerno further opines that coercion existed in part because of Major Doherty's exclamation later in the evening that defendant Picerno's "window of opportunity" was closing on his ability to cooperate. This Court finds, however, that Major Doherty's warning did not result in coercion of any kind or otherwise violate defendant Picerno's right to counsel. The detectives patiently waited about three hours for defendant Picerno to reach attorneys John and Tom DeSimone before honestly conveying that they needed to act quickly for defendant Picerno to cooperate successfully. All parties were aware that defendant Picerno wanted to cooperate, his arrest had to be kept secret for him to cooperate, and word of his arrest was spreading throughout the community. Such a state of events in no way operated to overcome defendant Picerno's free choice. Indeed, the detectives were simply conveying information that would allow the defendant to exercise the free choice that he desired — namely to cooperate. No one pressured defendant Picerno to abandon his desire to seek legal counsel. In fact, the authorities were helpful — far beyond any legal requirement — in defendant Picerno's search for another attorney. Defendant Picerno willingly sought another attorney so that he could continue to cooperate, as he desired to get advice before giving a statement and finalizing a deal.
Additionally, this Court finds nothing coercive or involuntary about defendant Picerno's participation in the sting operation or in recording the statement. Not only did testimony establish that defendant Picerno voluntarily participated in these events, but he also had the benefit of legal counsel before his participation in the sting operation, as well as before and during the recorded statement. The Court rejects defendant Picerno's claim that, on the morning of the scheduled sting operation, he requested to talk to his attorney. The Court instead accepts the credible, contrary testimony of Detective Lemont.
Regarding defendant Picerno's recorded statement, the Court finds neither a Fifth Amendment violation nor any element of coerciveness to add to the totality-of-circumstances medley. Indeed, Miranda establishes that the presence of an attorney during a custodial interrogation ensures that a suspect's statements are not the product of compulsion. See Miranda v.Arizona, 384 U.S. 436, 466, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694, 718-19 (1966). The presence of counsel is sufficient to make a police interrogation conform to the dictates of the Fifth Amendment privilege against coerced self-incrimination. Id.
Notwithstanding the defendant's tortured attempt to place attorney Revens "in and out" of the taking of the statement, this Court finds that attorney Revens was present during the entire time that defendant Picerno's formal statement was recorded on February 16, 2002.
Finally, the 27-hour period throughout February 15 and 16, 2002 when defendant Picerno was in custody did not constitute coercion or "unnecessary delay." Any so-called delay was necessary, due to defendant Picerno's expressed willingness to cooperate after consulting legal counsel. The evidence demonstrates that the authorities acted as expeditiously as possible in conducting the sting operation and recording the formal statement the morning and afternoon following defendant Picerno's arrest. Furthermore, aside from there being no unnecessary delay, no evidence exists to indicate that the delay induced defendant Picerno's confession. See State v. Lionberg, 533 A.2d 1172, 1178 (R.I. 1987).
 D. Compliance with Fifth Amendment Right to Counsel
After arriving at State Police headquarters and prior to the afternoon interrogation, defendant Picerno maintains that he requested legal representation from attorney Donald Lembo. Defendant Picerno alleges that the detectives refused to allow him to contact attorney Lembo because he was a suspect in the investigation. Due to the credible testimony from the State Police detectives and inconsistencies in defendant Picerno's testimony, the Court finds that defendant Picerno made no such request. Detective Casilli testified that defendant Picerno never asked for attorney Lembo and did not mention "attorney" until after 5:00 p.m. Detective Lemont provided consistent testimony. At most, attorney Lembo's name came up as a suspect in the investigation during the interrogation but not in relation to any request for legal counsel. The State also established that defendant Picerno knew, at the time of his interrogation, that attorney Lembo was out of town and unavailable, making his testimony that he asked to speak with him less than credible.
At the suppression hearing, defendant Picerno further acknowledged that he never asked for an attorney again during the afternoon session. Later in his direct examination, however, he contradicted himself. Defendant Picerno stated that he was concerned that he needed an attorney, and when questioned as to why he did not ask for one, he responded that he asked for one "six, seven, eight, nine times." The Court did not find this testimony credible; indeed, it was a reflection of defendant Picerno's frustration, after the fact, of the predicament that he placed himself in by not asking for counsel and instead speaking with the police in an attempt to cooperate and get himself a deal.
Defendant Picerno next maintains that, following the afternoon interrogation, he requested an attorney and "refused to go any further without consulting an attorney." Defendant Picerno seems to use this alleged refusal to support his totality-of-the-circumstances argument that his statements were unconstitutionally coerced self-incriminations. Aside from being a factor in a totality-of-the-circumstances argument, if he invoked his right to counsel in this fashion, that fact alone could be sufficient to compel suppression of his subsequent statements. See Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1980); Connecticut v. Barrett,479 U.S. 523, 107 S.Ct. 828, 93 L.Ed. 920 (1987). Once an accused states that he wants an attorney, the interrogation must cease. Edwardsv. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, L. Ed.2d 984 (1981). The so-called Edwards rule provides that an accused person in custody who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication with the police." Id.
Had defendant Picerno invoked his right to counsel or otherwise refused to continue without consulting an attorney, suppression of at least a portion of what defendant Picerno seeks to suppress may have been required.[24] This Court, however, finds that defendant Picerno did not unequivocally request counsel and thereby invoke his right to counsel. See Davis v. UnitedStates, 512 U.S. 452, 461-62, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362, 373 (1994); State v. Dumas, 750 A.2d 420, 424-25 (R.I. 2000) ("if a suspect makes an equivocal or ambiguous statement concerning an attorney, the police are not required to cease questioning"). A suspect's questioning regarding whether he needs a lawyer "is a request for advice and is not an unequivocal request for counsel." See State v. Dumas, 750 A.2d 420, 424 (R.I. 2000). This Court does not find credible defendant Picerno's testimony that he refused to continue without consulting an attorney. Rather, the Court finds credible the testimony of Detectives Casilli and Lemont that, upon attempting to record a statement, defendant Picerno merely questioned whether he should consult an attorney before recording a statement and participating in the sting operation. If a suspect's reference to counsel is ambiguous in that "a reasonable officer in light of the circumstance would have understood only that the suspect might be invoking [his or her] right to counsel . . .," the Edwards rule does not apply. Id. (quotingDavis, 512 U.S. at 458-59, 114 S.Ct. at 2355, 129 L.Ed.2d at 371). The detectives, therefore, were not required to cease their questioning because defendant Picerno did not invoke his right to counsel; his statements were not an unambiguous and unequivocal request for an attorney.
Moreover, even assuming, arguendo, that defendant Picerno did invoke his right to counsel, suppression of his subsequent statements would not be required if he made a limited request for counsel that the State Police did not violate. See Connecticutv. Barrett, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed. 920 (1987) (defendant who requests counsel for written statement does not invoke right to counsel in regard to oral statements). InConnecticut v. Barrett, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed. 920 (1987), the United States Supreme Court rejected the notion that a defendant's request for counsel before making a written statement invoked the right to counsel for all purposes.Barrett, 479 U.S. at 525-30, 107 S.Ct. at 830-33, 93 L.Ed. at 925-29. As nothing "requires authorities to ignore the tenor or sense of a defendant's response to [Miranda] warnings," the Court found that the Connecticut Supreme Court erred in finding that "a limited invocation of [defendant's] right to counsel prohibited all interrogation absent initiation of further discussion by [defendant]." Barrett, 479 U.S. at 527-28, 107 So. Ct. at 831, 93 L.Ed. at 927. The fundamental purpose of theMiranda decision is "`to assure that the individual's right tochoose between speech and silence remains unfettered throughout the interrogation process."' Id. (citing Miranda, supra) (emphasis in original).
Although the law regarding the limited invocation of the right to counsel is not well-established in this state, the Rhode Island Supreme Court has relied on Connecticut v. Barrett for the proposition that "a defendant who is fully warned underMiranda, who agrees to talk but refused to sign anything without counsel, does not invoke the right to counsel in regard to the oral statement." State v. Rossier, 672 A.2d 455, 457 (R.I. 1996). Sister jurisdictions have similarly relied onBarrett for cases analogous to the present matter. See,e.g., Brank v. Delaware, 528 A.2d 1185, 1188 (Del. 1987) (request for counsel unambiguously limited to blood test and medical treatment and thus Edwards rule not applicable to subsequent statements); United States v. Jardina, 747 F.2d 945, 949 (5th Cir. 1984) (defendant's statements admissible because defendant made a limited request for counsel, clearly indicating that he wanted an attorney to work out a cooperative deal with the government); United States ex rel. DeBaufer v. Lane, No. 87 C 7270, 1988 U.S. Dist. LEXIS 2622, at *12 (N.D. Ill. March 22, 1988) (admissibility of statements constitutionally proper because defendant only requested an attorney for the limited purpose of plea bargaining). In Lane, the defendant wished to "make a deal" and requested counsel to "participate in bargaining." Id. Based on Barrett, the court in Lane found that "a request for counsel can be for limited purposes;" therefore, "it was unnecessary to provide counsel since no plea negotiations were being had." Id.
In the instant case, if defendant Picerno invoked his right to counsel, he unambiguously limited such a request to the purpose of recording a statement and finalizing a deal beforeparticipating in the sting operation. Credible testimony and the statements and actions of defendant Picerno support a finding that defendant Picerno contemplated counsel only for recording a statement and finalizing a deal before cooperating in the sting. After defendant Picerno agreed to cooperate with the State Police and left a message with Oster toward that end, the detectives attempted to record defendant Picerno's statement. Defendant Picerno responded that he might not want to record a statement until he had a lawyer finalize his bargain with the prosecutors. Although credible witnesses at the hearing did not recall defendant Picerno's exact words, it is clear that defendant Picerno, following the request by the State Police to record his statement, uttered words to the effect that:
 1. I might be screwing myself if I don't have an attorney to finalize our deal before recording a statement; or
 2. I might screw myself if I give a taped statement without having an attorney to make the deal; or
 3. Should I have a lawyer to make a deal before giving a recorded statement? I don't want to screw myself.
Defendant Picerno did not indicate a desire to have an attorney present for further questioning; however, out of an abundance of caution, the detectives recommended that he obtain an attorney before continuing.
Just as in Barrett, defendant Picerno's limited request for counsel was accompanied by affirmative announcements of his willingness to continue cooperating with the detectives, and defendant Picerno's clear intentions were honored by the police.See Barrett, 479 U.S. at 529, 107 S.Ct. at 832, 93 L.Ed. at 928. Defendant Picerno expressly indicated that he wanted to cooperate and "keep his options open" while waiting for an attorney. In addition, defendant Picerno's conduct also confirms his intent to cooperate and have counsel only for limited purposes. After making his limited request for an attorney and before meeting with an attorney, defendant Picerno, for example: (1) asked his wife a number of times not to disclose his arrest because it might damage the investigation and his ability to cooperate; (2) told the detectives he had hidden cash in his home; (3) told his wife the exact location of the cash and that she should give it to the detectives; (4) answered a return call from Jonathan Oster and arranged for a meeting with him on the following day; and (5) after not being able to reach his attorney, agreed to contact another attorney to enable him to cooperate with the sting operation the following morning. Consequently, suppression of evidence is not required, as the authorities honored defendant Picerno's limited request for counsel by obtaining defendant Picerno's participation in the sting operation and defendant Picerno's recorded statement after he had received legal counsel. See Connecticut v. Barrett,479 U.S. 523, 107 S.Ct. 828, 93 L.Ed. 920 (1987) (defendant who requests counsel for written statement does not invoke right to counsel in regard to oral statements). After such a limited request for counsel, "[t]o conclude that [defendant] invoked his right to counsel for all purposes requires . . . a disregard for the ordinary meaning of [defendant's] statement." Id.
Consequently, this Court finds that defendant Picerno knowingly, intelligently, and voluntarily waived his Miranda
rights and that all of the statements he made to the detectives thereafter were voluntary. The Court is satisfied from the totality of the circumstances, based on the credible evidence, that the State has satisfied its burden of demonstrating by clear and convincing evidence that defendant Picerno waived hisMiranda rights and voluntarily made all of these statements without coercion of any kind. The totality of the circumstances shows no coercion or any other indicia of involuntariness. The State, therefore, did not violate defendant Picerno's state or federal constitutional rights against self-incrimination. Additionally, the State did not violate defendant Picerno's constitutional rights to counsel in any way. Accordingly, this Court denies defendant Picerno's motion to suppress his statements in its entirety.[25]
 III. DEFENDANT PICERNO'S MOTION TO SUPPRESS TANGIBLE EVIDENCE
Defendant Picerno also moves to suppress evidence seized from his residence on the evening of February 15, 2002. Defendant Picerno maintains that the detectives violated his constitutional right to be protected from an unreasonable search and seizure because his wife's consent to the search was the product of coercion and/or undue influence. Defendant Picerno reasons that: (1) the State failed to show that obtaining a warrant was impractical; and (2) the State Police obtained her consent to search through a promise to permit Mrs. Picerno to see him following the search.
The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." State v. Jennings,461 A.2d 361, 365 (R.I. 1983). "Governmental `searches conducted outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" Duquette v. Godbout,471 A.2d 1359, 1362 (R.I. 1984) (citing Katz v. United States,389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967) (citations omitted)). There is no doubt that a search conducted pursuant to valid consent is a constitutionally permissible exception. State v. Beaumier, 480 A.2d 1367, 1374, overruledon other grounds by State v. Rios, 702 A.2d 889, 889-90 (R.I. 1997). The State must prove, by a preponderance of the evidence, that the purported consent to search was freely and voluntarily given. United States v. Marshall, 348 F.3d 281, at *10-12 (1st Cir. 2003); State v. Martinez, 624 A.2d 291, 296 (R.I. 1993). "The voluntariness of a consent to search turns on an assessment of the totality of the circumstances. . . ." United States v.Luciano, 329 F.3d 1, 9 (1st Cir. 2003). Such an assessment is a question of fact for the trial justice. United States v.Marshall, 348 F.3d 281, at *10-12 (1st Cir. 2003). Some of the factors to be considered include age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics. Id.
Defendant Picerno's arguments regarding a search and seizure violation are misplaced. First, a person's consent to a search is not rendered invalid because there was no exigency or impracticability of obtaining a warrant. See State v.Hightower, 661 A.2d 948, 960 (R.I. 1995). The Rhode Island Supreme Court has held that it is "well established that a search conducted pursuant to a valid consent is constitutionally permissible." State v. Hightower, 661 A.2d 948, 960 (R.I. 1995) (citing United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)); accord State v. Beaumier,480 A.2d 1367, 1374 (R.I. 1984); Palmigiano v. Mullen, 119 R.I. 363, 370 (R.I. 1977). Second, Inspector Johnson presented credible, uncontradicted testimony that he did not condition Mrs. Picerno's ability to see her husband on her consent to the search.[26] Mrs. Picerno stated, "Let's say I let you search, could I see my husband after that happens." Inspector Johnson replied, "absolutely, of course you can see your husband" The Court finds nothing constitutionally suspect regarding this dialogue, particularly in light of the totality of the circumstances. Evidence presented at the hearing indicates that Mrs. Picerno was not subject to undue influence, coercion, or promises of any kind. Mrs. Picerno provided her consent to the search both verbally and in writing. She also appeared on videotape displaying the executed consent form. In executing the "Consent to Search" form, Mrs. Picerno acknowledged that she authorized the search after "having been informed of [her] right not to have a search made . . . and of [her] right to refuse to consent to such a search. . . ." State's Exhibit 7 (consent to search form).
Moreover, a number of circumstances surrounding the search provide indicia of an intelligent and voluntary consent. Mrs. Picerno was not placed in custody or restrained in any way. The detectives neither brandished their weapons nor displayed any force. She never asked the detectives to leave. Mrs. Picerno exemplified her actual and full knowledge of her ability to withhold consent by having the detectives wait for approximately forty minutes while she deliberated whether to allow the search. Mrs. Picerno had free access to her telephone and spoke to a number of parties. Lastly, Inspector Johnson's statement that the State Police could get a warrant regardless of her consent was not inherently coercive. United States v. Marshall,348 F.3d 281, at *10-12 (1st Cir. 2003) (finding statement that officers were going to search the apartment regardless of occupant's consent was not inherently coercive because officers had good faith belief that a warrant could be obtained).
Based on the evidence presented at the hearing, therefore, the totality of the circumstances show by a fair preponderance of the evidence that Mrs. Picerno's consent was made freely, intelligently, and voluntarily, without coercion of any kind. The State did not violate defendant Picerno's protection against unreasonable searches and seizures. Accordingly, defendant Picerno's motion to suppress tangible evidence is denied.[27]
 CONCLUSION
For the foregoing reasons, this Court denies defendant Picerno's motion to suppress in its entirety. The State did not violate defendant Picerno's constitutional rights against self-incrimination, freedom from unreasonable searches and seizures, or right to counsel. The Court is satisfied from all of the credible evidence and from the totality of the circumstances that the State has met its burden of demonstrating, by clear and convincing evidence, that defendant Picerno understood hisMiranda rights, and knowingly, intelligently, and voluntarily waived those rights, and made all statements voluntarily, without coercion of any kind. Moreover, the State did not violate defendant Picerno's right to counsel in any way. In addition, the totality of the circumstances show, by a fair preponderance of the evidence, that Joyce Picerno's consent was made freely, intelligently, and voluntarily, without coercion of any kind. Consequently, the Court declines to suppress: (1) any statements made by defendant Picerno on February 15, 2002 and February 16, 2002; and (2) any tangible evidence seized from his residence on February 15, 2002. Defendant Picerno's motion to suppress is denied in its entirety.
[1] Defendant Picerno, together with co-defendant Jonathan Oster, also has filed a motion to suppress voluminous wiretap electronic surveillance evidence on the grounds that the interceptions violated the wiretap order and state and federal law. That motion is pending additional briefing and decision by this Court.
[2] A summary of the pertinent factual findings of this Court directly follows; additional factual findings are provided in later parts of this decision in which this Court analyzes the issues presented by defendant Picerno's suppression motion. The Court bases its factual findings on the credible evidence offered at the hearing and the reasonable inferences drawn therefrom. Due to the pendency of defendant Picerno's motion to suppress wiretap evidence, the Court has not based its factual findings in whole or in part on the wiretap evidence that the State introduced at the suppression hearing. The substance of those wiretap tapes, however, is not inconsistent with the facts as found by this Court.
[3] See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Defendant Picerno was referring to Jonathan F. Oster, the Lincoln Town Administrator. Mr. Oster was another subject of the State Police Financial Crime Unit's bribery and corruption probe.
[5] The Attorney General's Office was aware of potential criminal liability of defendant Picerno's wife and son for mortgage fraud.
[6] The plan was for defendant Picerno to deliver so-called "bribe money" to Mr. Oster for Oster's assistance in facilitating a real estate transaction involving the H H Screw property.See discussion, infra.
[7] Attorney David Revens did not testify at the suppression hearing.
[8] The State introduced and played the audio tape of the interview at the suppression hearing.
[9] When a statement is obtained through a custodial interrogation, the State bears the burden of proving that the defendant knowingly, intelligently, and voluntarily waived the constitutional rights expressed in Miranda v. Arizona,384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). State v.Apalakis, 797 A.2d 440, 447 n. 4 (R.I. 2002); State v. Girard,799 A.2d 238, 250 (R.I. 2002).
[10] A distinction exists, for example, because "evidence secondarily derived from a police interrogation may be admissible even though the police fail to comply with the procedural safeguards outlined in Miranda if the confession is otherwise truly voluntary." State v. Amado, 424 A.2d 1057, 1061 (R.I. 1981). The issues are also separate because Miranda rights need not be waived where the incriminatory statements were not obtained during a custodial interrogation. Similarities exist because the circumstances of the Miranda warnings may affect a finding of voluntariness. Id. at 1062.
[11] The Rhode Island Constitution provides the same protection against self-incrimination as that guaranteed by the Fifth Amendment to the Constitution of the United States. Rhode IslandGrand Jury v. John Doe, 641 A.2d 1295, 1296-97 (1994). The protections against self-incrimination "under article 1, section 13 of the Rhode Island Constitution have been interpreted uniformly as tantamount to those available under the Federal Constitution in matters relating to, for example, Miranda
rights and waiver of those rights. . . ." State v. Bertram,591 A.2d 14, 21 (R.I. 1991); see also State v. Dumas,750 A.2d 420, 424 n. 4 (R.I. 2000) (refusing to extend broader custodial interrogation and self-incrimination rights under the Rhode Island Constitution to persons than those guaranteed by the Fifth Amendment to the United States Constitution).
[12] It is apparent that the rights form contained the properMiranda admonitions. Indeed, defendant Picerno does not challenge the adequacy of these warnings or his receipt of them. The form provides:
 1. I do not have to give a statement.
 2. I have the right to remain silent.
 3. Anything I say can and will be used against me in a court of law.
 4. I have the right to the presence of an attorney prior to and during any questioning by the police.
 5. I have the right to the presence of an attorney during a lineup or confrontation of witnesses, if any line-up or such confrontation takes place.
 6. If I cannot afford an attorney, one will be appointed for me prior to any questioning, if I so desire.
 I further admit and agree that:
 7. After having been informed of my constitutional rights, I do understand these rights, and I agree to give a statement at this time.
 8. I do not want an attorney called or appointed for me at this time.
State's Exhibit 2.
[13] Defendant Picerno does not contest initialing next to the paragraphs numbered 1, 2, 3, 4, 5, and 6.
[14] Furthermore, an explicit written statement of waiver is not required. A waiver of Miranda rights must be decided upon the facts of each case. North Carolina v. Butler, 441 U.S. 369, 374-75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286, 293 (1979).
[15] Defendant Picerno (1) provided a substantial statement to the detectives; (2) offered to be a cooperating witness; (3) asked his wife a number of times not to disclose his arrest because it might damage the investigation and his ability to cooperate; (4) told the detectives that he had hidden the cash in his home; (5) told his wife the exact location of the cash and that she should give it to the detectives; (6) placed a telephone call to his alleged co-conspirator, Jonathan Oster, to set up a meeting; (7) answered a return call from Jonathan Oster and arranged for a meeting the following day as part of the sting operation; (8) suggested to the detectives that $10,000 would be more believable for him to pass to Oster than the $15,000 amount that the police suggested; and (9) after not being able to reach his attorney, agreed to contact another attorney to enable him to cooperate with the sting operation the following morning.
[16] The State acknowledged that it could interpose objections to the defendant's motion to postpone the Court's decision and his motion to reopen the suppression hearing, but it declined to object so as not to create any unnecessary appellate issues.
[17] To assist Mr. Shure in comparing and contrasting defendant Picerno's known initials with the questioned initials, he asked defendant Picerno to repeatedly write his initials on a sheet of paper. Such samples provided upon request are known as "exemplars." Conversely, examples written in the past, in the normal course of events, are known as "historical writings" or "course-of-business writings." The experts also refer to "contemporaneous writings," which are samples written close in time to the questioned writings.
[18] This Court makes no determination, at this stage of the proceedings, as to whether the expert witnesses presented by the parties during the suppression hearing are sufficiently qualified and their scientific reasoning and methodology sufficiently reliable to allow their opinions to be put before a jury. Such questions of admissibility under Rule 702 are reserved for another day should any party seek to offer such testimony at trial. See generally State v. Quattrocchi, 681 A.2d 879
(R.I. 1996); see also DiPetrillo v. Dow Chemical Co.,729 A.2d 677, 684-86 (R.I. 1999) (discussing the preliminary evidentiary hearing required in Quattrocchi before allowing a jury to hear questionable scientific testimony).
[19] By concluding the defendant's testimony at the suppression hearing and then resting its case without calling a handwriting expert (or even indicating its intent to do so), the defense conveniently insulated defendant Picerno from any cross-examination concerning: (1) his initialing of historical documents; (2) the inconsistency among his initials on the rights forms and between those initials and his exemplars; and (3) the circumstances under which he made the initials on the different document. Those questions only became relevant after defendant Picerno was off the stand when the defense reopened its case to present expert handwriting testimony.
[20] Mr. Shure testified that defendant Picerno told him which of the initials on the rights form were his own and which of the initials were in dispute.
[21] Mr. Shure testified that he knew defendant Picerno would call him to testify if his opinion favored Picerno. Mr. Shure's fee for his analysis was $125 per hour. For testifying in Court, however, Mr. Shure would receive a $1000 bonus, an increased hourly fee of $160 per hour, $125 per hour for travel time, 40 cents per mile traveled, and parking fees.
[22] As the Rhode Island Supreme Court stated, Ockham's razor is "[a]n eponymous `principle of parsimony' taking its name from William of Ockham, a fourteenth century Franciscan philosopher who prized economy of explanation, Ockham's razor slices away surplusage." State v. Griffin, 691 A.2d at 558 n. 1 (citing 8 The Encyclopedia of Philosophy 306-07 (1967)).
[23] Defendant's apparently misconceived definition of voluntariness is particularly evident upon considering that defendant Picerno, on cross-examination, refused to characterize as voluntary his continued cooperation with the State Police in May, June, and July, 2002. Defendant called his continued cooperation, "somewhat voluntary."
[24] As noted, supra, the right to counsel in this context is derived from the Fifth Amendment, not the Sixth Amendment. Like the so-called "Miranda Warnings," this right to counsel is a prophylactic right that accompanies the right against self-incrimination, in order to "counteract the inherently compelling pressures of custodial interrogation[s]. . . ."McNeil, 501 U.S. at 175-76, 111 S.Ct. at 2207-08, 115 L.Ed.2d at 166-67; see also State v. Dumas, 750 A.2d at 424.
[25] As more fully discussed below, the State did not violate defendant Picerno's constitutional rights by searching and seizing evidence from his residence. It bears noting that the Court has considered this search, which was occurring simultaneously with defendant Picerno's interrogation, in weighing the voluntariness of defendant Picerno's statements under the totality of the circumstances test. The below-discussed search had no coercive effect on defendant Picerno and his providing of statements. In fact, defendant Picerno willingly assisted in the search by offering the location of the hidden cash and instructing his wife to direct the detectives to the cash. Though Picerno's assistance is helpful in showing the extent of defendant Picerno's cooperation and amicability during the interrogation, defendant Picerno's assistance, however, was not a legal prerequisite to the searach. See State v.Hightower, 661 A.2d 948, 960 (R.I. 1995) (holding it well established that any co-inhabitant may validly consent to a search of premises shared with another).
[26] Joyce Picerno did not testify at the suppression hearing.
[27] In its post-hearing memorandum, the State invoked the doctrine of "inevitable discovery" to thwart suppression of the tangible evidence in this case. In addressing this issue, this Court notes that it would reach the same conclusion of not suppressing the seized tangible evidence, even if it had suppressed defendant Picerno's statement regarding the exact location of the cash as a violation of defendant Picerno's privilege against self-incrimination. The inevitable discovery doctrine allows for the admissibility of evidence if it "would inevitably have been discovered without reference to the police error or misconduct, [and if] there is no nexus sufficient to provide a taint. . . ." State v. Firth, 708 A.2d 526, 529 (R.I. 1998) (quoting Nix v. Williams, 467 U.S. 431, 448, 104 S.Ct. 2501, 2519, 81 L.Ed.2d 377, 390 (1984)). The State must "show by a preponderance of the evidence that the government would have discovered the evidence had the constitutional violation to which the defendant objects never occurred." St. Yves v. Merrill, No. 03-1709, 2003 U.S. App. LEXIS 21067, at *6 (1st Cir. Oct. 17, 2003). Based on Inspector Johnson's testimony, this Court is satisfied, by a preponderance of the evidence, that the authorities knew the cash was hidden in the house and would have continued searching until it was found. Although some of the cash wrapped in the freezer appeared to be an ice cream sandwich, as so noted by the detectives when encountering it, there was nevertheless a high probability of it being discovered. The term "inevitable" is "something of an overstatement. . . . [W]hat is required is a high probability that the evidence would have been discovered by lawful means." Id. (citing States v. Rogers,102 F.3d 641, 646 (1st Cir. 1996)).