STATE

v.

Peter APALAKIS.

No. 2000–439–C.A.

Supreme Court of Rhode Island.

May 15, 2002.

## OPINION

LEDERBERG, J.

The defendant, Peter Apalakis, has appealed a judgment of conviction for possession of a controlled substance with intent to deliver, in violation of G.L.1956 § 21–28–4.01(A). On appeal, the defendant has argued that the trial justice erred in denying his motion to suppress statements that the defendant made to police, along with evidence seized in his apartment. We affirm the conviction.

### Facts and Procedural History

On October 26, 1998, Newport police officer Sgt. Russell Carlone (Sgt.Carlone), three other detectives, and two uniformed officers of the Newport police executed a search warrant at defendant's apartment. The search warrant was predicated on information provided by a "reliable and credible cooperating witness," who claimed to have purchased drugs from defendant during a controlled buy. Upon entering the apartment, the police officers encountered three people, one of whom was identified as defendant. The officers searched and handcuffed the three individuals, in accordance with the narcotic unit's department policy. Once handcuffed, defendant was separated from the other individuals and questioned by Sgt. Carlone.

Sergeant Carlone testified at a later suppression hearing that he took defendant aside, informed him of the search warrant, read him his *Miranda*[1] rights, and advised defendant that "if he wished to cooperate and tell [Sgt. Carlone] if there were any drugs in his room, now would be the time." According to Sgt. Carlone, after a minute or two of conversation, defendant agreed to direct the officer

Jane M. McSoley, Aaron L. Weisman, Providence, for Plaintiff.

Joseph T. Houlihan, Kathleen Managhan, Newport, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

1. *Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966).

to a bureau drawer in his bedroom where defendant had hidden about seventy tablets of methylene dioxymethamphetamine, also known as "MDMA" or "ecstasy." The police also found some drug paraphernalia, marijuana, and ketamine—an animal tranquilizer—in the apartment. Another officer present during the entire search, Sgt. Michael McKenna (Sgt. McKenna), also testified that from the time the police entered the apartment until the drugs were found was "less than five minutes." Later toxicology reports showed that "the substance which was seized from the defendant's apartment did, in fact, test positive for methylene dioxymethamphetamine."

The defendant's version of events differed from that of the police officers. According to defendant, after he was handcuffed and shown the search warrant, Sgt. Carlone led him into a common hallway of the apartment complex and asked him if he had any cocaine, ecstasy, or marijuana in his apartment. The defendant testified that when he denied possessing any drugs, Sgt. Carlone raised his voice and repeatedly asked him whether he had any controlled substances in the apartment. According to defendant, Sgt. Carlone also told him that the police were going to find the drugs whether defendant helped them or not, "so it would be in [defendant's] best interest if [he] helped him because that way [defendant's] apartment wouldn't get trashed." The defendant asserted that while he had still not been informed of his *Miranda* rights, Sgt. Carlone took him upstairs into the bathroom of the apartment, locked the door, and after further conversation, Sgt. Carlone allegedly promised to "drop the charges" if defendant helped the police in finding defendant's source for narcotics. At that point, defendant led Sgt. Carlone to his bedroom and removed the ecstasy from a slat behind a drawer in his bureau. By defendant's account, once the drugs were found, Sgt.

Carlone was not "as enthusiastic" about the promise to drop the charges, but did say that if defendant cooperated in the effort to catch his supplier, "the best case scenario was that the charge would be dropped." Sergeant Carlone, on the other hand, testified that he merely told defendant that he would inform the Attorney General of defendant's cooperation if defendant helped the police apprehend his narcotics supplier.

Eventually, defendant agreed to wear an "audio listening device" during a controlled drug buy with his alleged supplier, one George Greenman (Greenman). Sergeants Carlone and McKenna gave defendant money and drove defendant to Greenman's residence, but Greenman was not at home. They subsequently found Greenman in the library at Salve Regina University, where defendant was a criminal justice major on an ROTC scholarship. The defendant spoke to Greenman in an attempt to arrange a drug purchase. The attempt did not prove fruitful, however, because defendant's "cover was blown" when Greenman spotted defendant entering an undercover police vehicle. The defendant was charged with possession of a controlled substance with intent to deliver, and according to Sgt. Carlone, the Attorney General's office was informed of defendant's cooperation in the investigation of Greenman.

The trial justice denied defendant's request for a *Franks* hearing on the validity of the affidavit that supported the warrant to search his apartment, and defendant, at oral argument, waived any challenge to the denial. *See Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667, 682 (1978) (establishing a defendant's right to a hearing upon an offer of proof of "deliberate falsehood or of reckless disregard for the truth" in the warrant affidavit). At that time, the trial justice determined that "the warrant was sufficient for

purposes of probable cause; that there was no reason to hold further inquiry regarding the contents of the warrant, and that * * * probable cause in fact existed for the issuance of the warrant by the district court judge."

A two-day hearing was held on defendant's motion to suppress both his statements to the police and the drugs seized as a result of the statements. In a bench decision issued on November 12, 1999, the trial justice denied defendant's motion to suppress. The defendant subsequently elected to waive his right to a jury trial, and the parties agreed to submit the case to the trial justice without further witness testimony, subject to defendant's right to appeal the denial of his motion to suppress. The trial justice found defendant guilty of unlawful possession of a controlled substance with intent to deliver and sentenced him to three years, suspended, with three years probation and 250 hours of community service. This appeal followed.

### Standard of Review

■ In reviewing the trial justice's denial of defendant's motion to suppress the incriminating statements and evidence, we defer to the factual findings of the trial justice, applying a "clearly erroneous" standard. *State v. Page,* 709 A.2d 1042, 1044 (R.I.1998). With respect to questions of law and mixed questions of law and fact involving constitutional issues, however, this Court engages in a *de novo* review in accordance with *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). *Page,* 709 A.2d at 1044 (citing *State v. Nardolillo,* 698 A.2d 195 (R.I.1997)

and *State v. Campbell,* 691 A.2d 564 (R.I. 1997)). Whether defendant's detention constituted an "unreasonable seizure" and whether defendant's statements to police were "voluntary" are both questions that this Court reviews *de novo. State v. Kryla,* 742 A.2d 1178, 1182–83 (R.I.1999); *Page,* 709 A.2d at 1044.

### Constitutionality of the Seizure

■ On appeal, defendant argued that by handcuffing him and isolating him in order to elicit incriminating statements, the officers conducted an unreasonable seizure in violation of the Fourth Amendment. We disagree. The Fourth Amendment to the Constitution of the United States, applicable to the states through the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961), provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." [2] U.S. Const. Amend. IV.

It was undisputed that, during the search of defendant's apartment, defendant was not free to leave, and he was therefore "seized" for Fourth Amendment purposes. *See Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565, 571–72 (1988) (holding that a person is seized "only if, in view of all of the circumstances surrounding the incident, a reason-

---

**2.** Article 1, section 6, of the Rhode Island Constitution contains language nearly identical to its federal counterpart and provides:
"The right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures,

shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched and the persons or things to be seized."

able person would have believed that he [or she] was not free to leave") (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980) (opinion of Stewart, J.)); *see also Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889, 905 n. 16 (1968) (holding that a seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen").

■ In general, the Fourth Amendment requires that "an official seizure of the person * * * be supported by probable cause, even if no formal arrest is made." *Michigan v. Summers*, 452 U.S. 692, 696, 101 S.Ct. 2587, 2591, 69 L.Ed.2d 340, 345 (1981) (citing *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). The Supreme Court, however, has carved out several exceptions to this bedrock requirement. *See, e.g., Summers*, 452 U.S. at 705 n. 21, 101 S.Ct. at 2595–96 n. 21, 69 L.Ed.2d at 351 n. 21 (holding that the "routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant" was reasonable under the Fourth Amendment in the absence of probable cause for arrest); *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 617 (1975) (holding that a brief investigatory stop of a vehicle by a border patrol officer was reasonable in the absence of probable cause when the officer's action was supported by a reasonable suspicion "that a particular vehicle may contain aliens who are illegally in the country"); *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909 (holding that a warrantless "stop and frisk" of a suspect was reasonable under the Fourth Amendment in the absence of probable cause when the police officer had a "reason to believe" that the suspect was armed and dangerous).

In *Summers*, members of the Detroit Police Department were about to execute a warrant to search a house for narcotics, when they encountered the defendant on the front steps of the house. *Summers*, 452 U.S. at 693, 101 S.Ct. at 2589, 69 L.Ed.2d at 343–44. The police detained the defendant during the search and, when they had found narcotics in the house, placed the defendant under arrest, and searched his person, a search that yielded a quantity of heroin. *Id.* at 693, 101 S.Ct. at 2589, 69 L.Ed.2d at 344. In holding that the detention of the defendant did not violate the Fourth Amendment, the Supreme Court explained that "some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment." *Id.* at 697, 101 S.Ct. at 2591, 69 L.Ed.2d at 346. "In these cases the intrusion on the citizen's privacy 'was so much less severe' than that involved in a traditional arrest that 'the opposing interests in crime prevention and detection and in the police officer's safety' could support the seizure as reasonable." *Id.* at 697–98, 101 S.Ct. at 2591, 69 L.Ed.2d at 346 (quoting *Dunaway*, 442 U.S. at 209, 99 S.Ct. at 2255, 60 L.Ed.2d at 833–34).

The Supreme Court in *Summers* was careful to distinguish *Dunaway*, in which the defendant, a murder suspect, had been taken from a neighbor's house to the police station and interrogated until he confessed, at which point he was formally arrested. *Summers*, 452 U.S. at 696–98, 101 S.Ct. at 2591, 69 L.Ed.2d at 345–46. Noting that "the detention of [the defendant in *Dunaway*] was in important respects indistinguishable from a traditional arrest," *id.* at 696–97, 101 S.Ct. at 2591, 69 L.Ed.2d at 346 (quoting *Dunaway*, 442 U.S. at 212, 99 S.Ct. at 2256, 60 L.Ed.2d at 835–36), the Court stated, "any 'exception' that could cover a seizure as intrusive as that [in *Dunaway*] would threaten to swallow

the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Id.* at 697, 101 S.Ct. at 2591, 69 L.Ed.2d at 346 (quoting *Dunaway,* 442 U.S. at 213, 99 S.Ct. at 2257, 60 L.Ed.2d at 836). The Court contrasted the "custodial interrogation" in *Dunaway* with the "substantially less intrusive" detention in *Summers:*

> "[T]he type of detention imposed here [in *Summers*] is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention. Moreover, because the detention in this case was in respondent's own residence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Summers,* 452 U.S. at 701–02, 101 S.Ct. at 2594, 69 L.Ed.2d at 349.

The Court continued:

> "Moreover, unlike the seizure in *Dunaway,* which was designed to provide an opportunity for interrogation and did lead to Dunaway's confession, the seizure in this case is not likely to have coercive aspects likely to induce self-incrimination." *Id.* at 702 n. 15, 101 S.Ct. at 2594 n. 15, 69 L.Ed.2d at 349 n. 15.

Not only did the Court conclude that the detention in *Summers* was less intrusive than the seizure in *Dunaway,* it further found that the detention in *Summers* was supported by legitimate state interests, including the "law enforcement interest in preventing flight in the event that incriminating evidence is found" and "the interest in minimizing the risk of harm to the officers" inherent in the execution of a search warrant for narcotics. *Id.* at 702, 101 S.Ct. at 2594, 69 L.Ed.2d at 349.

Also of "prime importance" to the Court was the fact that a search warrant had been obtained, thereby indicating that "[a] neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the person who resided there." *Summers,* 452 U.S. at 701, 101 S.Ct. at 2593, 69 L.Ed.2d at 349. Consequently, the detention represented only an "incremental intrusion" on the personal liberty of the occupant. *Id.* at 703, 101 S.Ct. at 2594, 69 L.Ed.2d at 350. The Court concluded that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705, 101 S.Ct. at 2595, 69 L.Ed.2d at 351. The Court left open the possibility that "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case." *Id.* at 705 n. 21, 101 S.Ct. at 2595 n. 21, 69 L.Ed.2d at 351 n. 21.

Here, as was the case in *Summers,* the detention occurred in defendant's home, during a search for narcotics pursuant to a valid warrant founded on probable cause.[3] The law enforcement interests present in *Summers*—in particular the interest in the officers' safety—were likewise implicated in this case. Unlike Summers, however, here defendant was handcuffed, searched, and questioned by police during the course of his detention.

Standing alone, "the use of handcuffs does not necessarily turn an encounter into

---

**3.** In ruling on defendant's motion for a *Franks* hearing, the trial justice found that the search warrant was based on probable cause, and defendant has not challenged that finding on appeal.

an arrest for which probable cause is required." *United States v. Fountain*, 2 F.3d 656, 666 (6th Cir.1993) (citing *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir.1989)). In the case at bar, we agree with the trial justice that the use of handcuffs was justified by the legitimate safety interests of the officers, considering the "inherent dangerousness" of a search for narcotics. *State v. Alamont*, 577 A.2d 665, 668 (R.I.1990); *see also Summers*, 452 U.S. at 702, 101 S.Ct. at 2594, 69 L.Ed.2d at 349–50 ("Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence."). Taking aside a suspect during questioning is a customary tactic when several individuals are present. A defendant in such circumstances might identify one of the other individuals as the owner or the supplier of the contraband, an admission that would be less likely to occur in the presence of the person named. As Sgt. Carlone put it, "that's a common police technique basically to separate suspects so they don't get a chance to talk to each other."

In regard to the circumstances surrounding the questioning of defendant, in her decision, the trial justice generally credited Sgt. Carlone's version of events, according to which:

"[defendant], along with the other persons present at the scene, were handcuffed, and [defendant] was advised of the reason that the police were there in his apartment; specifically he was told that they were going to execute a search warrant.

The credible evidence suggests that [defendant] was advised of his Miranda rights and that he was told that if he wished to cooperate with the police that prior to the search beginning was the appropriate time to do so."

These factual findings were not clearly erroneous. *Page*, 709 A.2d at 1044. Because we accept the trial justice's factual finding that defendant was informed of his *Miranda* rights prior to any questioning, we do not reach the question of whether the statements and evidence would have been admissible in the absence of such warnings. In addition, unlike the situation in *Dunaway*, the record in the case at bar indicated that the detention and questioning of defendant occurred in defendant's home and lasted only about five minutes. Moreover, on appeal, defendant has not challenged the trial justice's finding that "probable cause in fact existed for the issuance of the warrant." Based on these facts, we reject defendant's argument that his detention was "exploited and prolonged in order to obtain information beyond that provided in the warrant," and we conclude that the seizure of defendant did not violate the Fourth Amendment.

### Voluntariness of Defendant's Statements

■ We next address defendant's argument that his statements were coerced and, therefore, that the statements and any evidence procured as a result should have been suppressed. "Both the Rhode Island and the Federal Constitutions bar the use in a criminal trial of a defendant's involuntary statements." *State v. Marini*, 638 A.2d 507, 512 (R.I.1994) (quoting *State v. Griffith*, 612 A.2d 21, 25 (R.I.1992)). To determine whether a statement was voluntary, this Court looks to the totality of the circumstances. *Id.* If, in light of all the facts and circumstances, a statement was "the product of [a defendant's] free and rational choice," *State v. Amado*, 424 A.2d 1057, 1062 (R.I.1981) (quoting *Greenwald v. Wisconsin*, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77, 80 (1968) (per

curiam)), the statement was voluntary. If, however, the statement was "the result of * * * coercion that had overcome the defendant's will at the time he confessed," the statement must be suppressed. *Amado*, 424 A.2d at 1062 (citing *Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922, 926 (1963)). The prosecution bears the burden of proving that a defendant's statements were voluntary by at least a preponderance of the evidence. *State v. Pacheco*, 481 A.2d 1009, 1023 (R.I. 1984). Moreover, in Rhode Island, the state must furnish clear and convincing evidence of voluntariness. *Id.; Amado*, 424 A.2d at 1061.[4]

■ In this case, defendant pointed to a number of factors that he claimed rendered his statements involuntary, including (1) handcuffing, (2) his alleged isolation and interrogation in a locked room, (3) police "threats" concerning the destruction of property during the search, (4) Sgt. Carlone's statements that "now would be the time" to cooperate and that discovery of controlled substances was inevitable, (5) intimidation and the use of a raised voice by Sgt. Carlone, (6) Sgt. Carlone's alleged promise to "drop the charges" if defendant cooperated, (7) defendant's youth and inexperience with police, and (8) defendant's initial denial of Sgt. Carlone's accusations, a denial that was recanted only after repeated questioning. In reviewing defendant's claim, this Court must adhere to the factual findings of the trial justice, unless those findings were clearly erroneous. *Page*, 709 A.2d at 1044. Here, in ruling on the motion to suppress defendant's statements, the trial justice credited the testimony of Sgt. Carlone, a police officer with fifteen years of experience. The trial justice explicitly found that Sgt. Carlone gave defendant his *Miranda* rights and that the sergeant never promised to dismiss the charges in exchange for defendant's cooperation. These findings were not clearly erroneous.

Responding to the other factors raised by defendant, the trial justice found that the use of handcuffs was "reasonable for purposes of protecting the police and of protecting the sanctity of the premises itself." She further found that police statements to the effect that " 'If you cooperate, the police,' essentially, 'won't trash your apartment' " were proper because such a statement was "not misinformation, it [was] just a statement of correct information as to what the search process is like." In denying the motion to suppress, the trial justice concluded:

> "[W]hen analyzing the statements made specifically at the apartment regarding the location of the drugs and the totality of the circumstances that were present at the time leads the Court to conclude that, given the propriety of having the defendant secured, given the Court's belief that the defendant was in fact given his Miranda rights, and given the fact that the statements, even if I were to accept the defendant's version as true, that the statements made by the police officer were proper and in accordance with what our Supreme Court has said that the police can say to a defendant, that the totality of those circumstances is such that the defendant's statements

---

4. In cases in which a statement was obtained through custodial interrogation, the state also bears the burden of proving that the subject knowingly and intelligently waived *Miranda* rights before the statement was made. *Miranda*, 384 U.S. at 478–79, 86 S.Ct. at 1630, 16 L.Ed.2d at 726; *State v. Griffith*, 612 A.2d 21, 25–26 (R.I.1992). Because defendant here has not challenged the admissibility of his statements on the basis that his *Miranda* rights were violated, we do not address whether this was a custodial situation requiring the administration of *Miranda* rights.

were in fact freely and voluntarily given when he in fact told the officers the location of those drugs."

We agree with the trial justice.

■ Although the use of handcuffs is a factor to be considered in determining whether a statement was coerced, the presence of handcuffs does not render a statement involuntary *per se. See, e.g., United States v. Orso,* 266 F.3d 1030, 1039–40 (9th Cir.2001) (holding that "transporting a handcuffed suspect in the back seat of a patrol car" did not constitute coercion *per se;* otherwise, "virtually every arrest * * * would be in violation of the Constitution"); *United States v. Seni,* 662 F.2d 277, 281–82 (4th Cir.1981) (holding that involuntariness is to be determined from the " 'totality of all the surrounding circumstances' " and that handcuffs do not "establish involuntariness in and of themselves") (citing, *inter alia, United States v. Ogden,* 572 F.2d 501, 502–03 (5th Cir.1978) (per curiam)).

Moreover, crediting Sgt. Carlone's version of events, the tactics employed by police in questioning the defendant were not improper. It is well established that law enforcement agents do not automatically exceed the bounds of permissible police conduct by telling a suspect that his or her cooperation would be "helpful" or that a confession would "make it better." *Marini,* 638 A.2d at 513 (quoting *United States v. Davidson,* 768 F.2d 1266, 1271 (11th Cir.1985) and *State v. James,* 459 So.2d 28, 30 (La.App.1984)). Rather, such tactics must be considered in light of the totality of the circumstances. *Marini,* 638 A.2d at 512. Here, given the extremely short duration of the questioning and given the facts—as found by the trial justice—that the defendant was informed of his *Miranda* rights prior to questioning and that Sgt. Carlone did not make improper threats or promises but merely promised to communicate the defendant's cooperation to the Attorney General, we are of the opinion that the tactics employed by the officers present did not render the defendant's statements involuntary.

### Conclusion

In summary, we are of the opinion that, under the circumstances of this case, the brief detention and questioning of the defendant during the search of his apartment pursuant to a valid warrant did not constitute an unreasonable seizure, nor were the statements made by the defendant during his detention coerced. Instead, we concur with the trial justice that:

> "based upon all of the evidence that is before the Court, * * * the State has in fact met its burden of demonstrating defendant's guilt for this offense beyond a reasonable doubt, * * * that the defendant did in fact possess a controlled substance; that he did so knowingly and intentionally, and that he did so with the specific intent to deliver it to his friends."

Therefore, we deny and dismiss the defendant's appeal, and we affirm the judgment of the Superior Court, to which we return the papers in the case.