**STATE**

v.

**Alonzo SHELTON.**

No. 2009–18–C.A.

Supreme Court of Rhode Island.

March 23, 2010.

 

Aaron L. Weisman, Department of Attorney General, Providence, for Plaintiff.

Susan B. Iannitelli, Esq., for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

Jessica Imran breathed her last on the floor of her Pawtucket home after suffering a gunshot wound to her head and neck in the early hours of July 27, 2006, after two men, one of whom was armed, forced their way into her apartment. With Ms. Imran was childhood friend Julie Lang, who suffered five gunshot wounds. Bleeding profusely and near death herself, Ms. Lang managed to call 911 after the assailants fled. The state argued that the defendant, Alonzo Shelton (defendant or Shelton), and his teenage nephew, Barry Offley, were behind this "planned execution," as the murderous assault was dubbed by the presiding trial justice. A jury ultimately found Shelton guilty of the murder of Ms. Imran, conspiracy with his nephew to murder Ms. Imran, assault of Ms. Lang in a dwelling with the intent to murder her, conspiracy to murder Ms. Lang, discharge of a firearm while committing a crime of violence that resulted in Ms. Imran's death, discharge of a firearm while committing a crime of violence that resulted in the injury of Ms. Lang, carrying a pistol without a license, and possession of a firearm after previously having been convicted of a crime of violence.[1] The trial justice, appalled by the particularly violent and cold-hearted nature of the crimes, meted out a hefty sentence to the defendant, a habitual offender who already was serving a suspended sentence. The defendant appeals from the judgment of conviction and sentence, raising several constitutional grounds. After careful review of the record, we are of the opinion that his arguments have no merit, and we affirm the judgment of the Superior Court.

## I

### Facts and Travel

It is not unfair to characterize defendant as a lifelong criminal. Shelton was involved in an on-and-off romantic relationship with Brenda Alvarez for about eight years, even developing a paternal relationship with her children. In July 2006, Shelton resided both at Ms. Alvarez's apartment in Central Falls and at his sister's home in Providence. However, Ms. Alvarez was not the only object of Shelton's affection; earlier in 2006 he also had been involved in an amorous connection with Ms. Lang.

In January 2006, while Shelton was riding as a passenger in Ms. Lang's car, a police officer stopped the vehicle because it had a broken taillight. The officer discovered that there were outstanding warrants for both Shelton and Ms. Lang, and both

---

1. Shelton and Offley were tried separately by agreement of the parties, with Shelton's trial taking place first. Because Shelton was serving a suspended sentence when he was charged with the crimes in this case, his trial served as both a violation hearing and a trial on the merits.

were placed under arrest. Unbeknownst to Ms. Lang, Shelton surreptitiously deposited cocaine into her purse just prior to their arrests so that he would not be apprehended with the drugs in his possession. Not surprisingly, Ms. Lang was charged with possession of the cocaine, and she was scheduled to appear in court in August. In the meantime, however, Shelton urged the unhappy Ms. Lang "to take the charge" by acknowledging that the drugs were hers because he was on probation and would be violated if he were charged. Because Shelton also was in the midst of a suspended sentence, he knew that he would face jail time, but that Ms. Lang, he reasoned, would not. Ms. Lang refused to go along with this scheme, however, and she prevailed upon him to take responsibility for his own actions. The dispute seriously undermined their relationship, which ended after this incident. Nonetheless, their argument over it continued until July 26, 2006, the last day that Shelton pressed his desire for Ms. Lang to take responsibility for the cocaine possession.

Shelton, who again was staying with Ms. Alvarez at her apartment in Central Falls, spent the evening of July 26, 2006, watching television, playing video games, and drinking beer with his nephew, Barry Offley. At 3:35 a.m. the following morning, Shelton and Offley told Ms. Alvarez's son that they were leaving for a while, but that they would return. Earlier on July 26, Ms. Lang and Ms. Imran had socialized together at Ms. Imran's apartment in Pawtucket. They left her home to go to Provi-

dence, returning at approximately 2 a.m. on July 27, 2006. As they relaxed in Ms. Imran's apartment, someone knocked on the apartment's door. Ms. Imran, who believed the visitor to be her boyfriend, asked Ms. Lang to answer the door.

But the man on the other side of the door was not Ms. Imran's boyfriend; according to Ms. Lang, it was Shelton and Offley. Ms. Lang was surprised to see Shelton, and he pushed open the door and stepped inside the apartment.[2] She said that she told him to leave, but she then heard a gunshot; she also heard Ms. Imran say that she almost had been shot. Ms. Lang said that it was then that she saw Offley holding a gun. He fired it again, and she watched as Ms. Imran fell to the floor.[3] The next shot was fired at her, but it missed. The gun somehow malfunctioned at that point and, according to Ms. Lang, Shelton grabbed it from Offley and shot Ms. Lang himself.

Despite her injuries, Ms. Lang found Ms. Imran's cellular phone and dialed 911. With her breathing severely labored, she managed to walk out of the apartment building, where she met a responding officer.[4] In his testimony, the officer described her as upset and bleeding. He said that Ms. Lang told him that she had been shot and, in response to his inquiries, she told him that Alonzo Shelton had shot her. She also provided Shelton's address in Central Falls.

While medical personnel transported Ms. Lang to the hospital, police officers

2. Cellular-phone records reflect calls between Shelton and Ms. Imran's phones. Ms. Lang maintains that she did not know that Shelton and Ms. Imran were acquainted and that it was not she who communicated with Shelton on Ms. Imran's cellular phone.

3. An autopsy later revealed that Ms. Imran was killed by a single gunshot wound to her

neck and head, and the cause of death was deemed to be homicide.

4. The police were able to locate Ms. Lang based on the general location of her emergency call as determined by a global positioning system.

from Pawtucket and Central Falls endeavored to locate the individuals who had attacked the women.[5] A number of officers responded to the Central Falls address given to them by Ms. Lang. When the officers arrived to the three-tenement apartment, they noticed that a light was on in the first-floor apartment despite the early hour of approximately 4:30 a.m. The officers also found that the exterior door to the three-tenement apartment was unlocked, and that the doorway to the first-floor apartment was "slightly open."

Knowing that there had been a shooting and that an armed suspect might be inside, the police entered the apartment. The first officer into the apartment proceeded directly to the lit room, a bedroom, and searched the closet and under and around the bed, looking for a suspect or a victim. While he was in the bedroom, the officer saw a ski mask, black gloves, and on the left of the bed, a backpack with its flap open. Inside the open backpack, the officer also saw what appeared to him to be a black gun box. Through the eye holes of the ski mask, the officer saw a clear plastic bag containing ammunition. Next to the bed, he saw an open safe.

However, the police did not find a suspect in the apartment; the only people present were three teenagers and a baby, all asleep. They awoke, and the police learned from them that the apartment belonged to Ms. Alvarez, Shelton's girlfriend.[6] The police then contacted Ms. Alvarez, who was at work. Understandably concerned about her children's safety and alarmed about the police presence in her home, Ms. Alvarez requested that the police leave her apartment. The officers complied; they remained in the hallway with the apartment's door ajar until Ms. Alvarez arrived home at approximately 6:30 a.m.

As soon as she got home, police officers informed her that they were investigating a homicide, and that Shelton was a suspect. A detective asked her to sign a consent-to-search form, which was read to her and which she read herself. She agreed to sign the form, indicating her consent to search. After she did so, two detectives accompanied Ms. Alvarez inside, and a search of her bedroom was completed. The items that the police had observed in the bedroom earlier were seized, along with two clips of ammunition that were found after the gun box was searched. Assorted loose ammunition was found in the backpack. Ms. Alvarez then was escorted to the Pawtucket police station so that she could provide a witness statement.

Meanwhile, the search for Shelton and Offley continued. The United States Marshals eventually found the pair and arrested them in Florida on September 7, 2006, after Shelton's cellular-phone use revealed his location. On October 4, 2006, a grand jury indicted Shelton and Offley on ten

---

**5.** According to the attending physician in the emergency room at the hospital, Ms. Lang suffered five gunshot wounds and was in critical condition. While she was receiving treatment, police officers obtained a statement from her, which she later said contained inaccuracies. The Pawtucket detective who attempted to take the statement from her on July 27, 2006, found it difficult to do so, because Ms. Lang was in "grave pain" and "going in and out of consciousness." Ultimately, he had to terminate the interview.

Lang also did not recall giving a tape-recorded statement to the police the next day, July 28, 2006, and again said later that that statement contained inaccuracies, such as her assertion in that statement that she didn't know who had shot her.

**6.** Two of the teenagers were Ms. Alvarez's children. The other teenager, who was the baby's mother, was Ms. Alvarez's niece.

counts.[7] They were charged with (1) first-degree murder of Jessica Imran in violation of G.L.1956 § 11–23–1 and § 11–23–2; (2) conspiracy to commit the crime of murder of Jessica Imran, in violation of G.L. 1956 § 11–1–6 and § 11–23–1; (3) assault on Julie Lang with a dangerous weapon in a dwelling with the intent to murder her in violation of G.L.1956 § 11–5–4; (4) conspiracy to murder Julie Lang in violation of § 11–1–6 and § 11–23–1; (5) burglary of the dwelling of Jessica Imran in violation of G.L.1956 § 11–8–1; (6) conspiracy to commit burglary in violation of § 11–1–6 and § 11–8–1; (7) carrying of a pistol without a license in violation of G.L.1956 § 11–47–8(a); (8) possession of a firearm following a previous conviction for a crime of violence in violation of § 11–47–5; (9) discharge of a firearm during a crime of violence, resulting in the death of Jessica Imran, in violation of § 11–47–3.2(b)(3); and (10) discharge of a firearm while in the commission of a crime, resulting in the injury of Julie Lang, in violation of § 11–47–3.2(b)(2). Shelton was tried before a jury in Superior Court in the spring of 2007.

Before his trial started, Shelton filed a motion to suppress the evidence that had been seized from Ms. Alvarez's apartment on the morning of July 27, 2006, after Ms. Alvarez gave the police consent to search the premises. He argued that exigent circumstances did not exist to justify the initial search of the bedroom, and that even if exigent circumstances did exist, the search "was conducted in violation of the scope of the exigent circumstances doctrine." He further argued that the second search "was conducted without the voluntary consent of Brenda Alvarez." Hearings on defendant's motion to suppress

were held on April 26 and 27, 2007. After hearing testimony from six witnesses, the trial justice denied the motion. The trial justice found that "there absolutely were exigent circumstances" because there was a "killer[ ] on the loose," that there were other tenants in the building, and that the officers did not have the benefit of "leisurely time." The trial justice ruled that the police "would have been absolutely derelict in their duty not to go in there." Then, while the police offers were lawfully on the premises, the trial justice found that they discovered certain items in plain view. He also found that Ms. Alvarez voluntarily consented to the search of her apartment.

After trial, the jury found defendant guilty of conspiring with Offley to murder Julie Lang, conspiring with Offley to murder Jessica Imran, of the first-degree murder of Jessica Imran, of assaulting Julie Lang with a dangerous weapon in a dwelling with intent to murder her, of discharging a firearm while committing a crime of violence that resulted in Jessica Imran's death, of discharging a firearm while committing a crime of violence that resulted in the injury of Julie Lang, of illegally carrying a firearm without a license, and of unlawfully possessing a firearm after previously having been convicted of a felony.[8] On July 6, 2007, the trial justice found that Shelton had violated the terms of his probation and sentenced him. The trial justice sentenced Shelton to serve all seventeen years of his previously imposed suspended sentence, with the remaining sentences imposed for his convictions in this case to be served consecutively to those seventeen years. On count 1 (murder of Jessica Imran), he

**7.** All counts were against both Shelton and Offley with the exception of count 8, which was against Shelton alone.

**8.** The two burglary counts were dismissed pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure prior to trial.

sentenced defendant to life in prison; on count 2 (conspiracy to murder Jessica Imran), he sentenced defendant to serve ten years; on count 3 (assault with a dangerous weapon within a dwelling), he sentenced defendant to life in prison; on count 4 (conspiracy to murder Julie Lang), he sentenced defendant to serve ten years; on count 7 (unlawful possession of a pistol without a license), he sentenced the defendant to serve ten years; on count 8 (unlawful possession of a firearm after previously being convicted of a crime of violence), he sentenced defendant to serve ten years; on count 9 (causing the death of Jessica Imran with a firearm), he sentenced defendant to a life sentence consecutive to that for count 1; and on count 10 (causing injury to Julie Lang with a firearm), he sentenced defendant to a twenty-year sentence to be served consecutively to count 3.[9] The trial justice then determined Shelton to be a habitual offender, and he sentenced him to twenty-five nonparolable years to be served consecutive to all other terms of imprisonment. Shelton timely appealed to this Court.

## II

### Discussion

On appeal, defendant raises three arguments. First, he argues that the trial justice erred when he permitted the introduction of evidence seized from Ms. Alvarez's bedroom in violation of the United States and Rhode Island Constitutions because Ms. Alvarez's consent for the search of her apartment was not voluntary. Second, he contends that the trial justice erred when he ruled that the state could inquire as to the length of Shelton's sus-

pended sentence and that he further erred when he informed the jury of the length of the suspended sentence. Finally, he challenges the term of the sentence imposed in this case as cruel and unusual under the United States and Rhode Island Constitutions, and he argues that several of the counts on which he was convicted should have been merged.

### A

### Motion to Suppress

At the hearing on the motion to suppress, Ms. Alvarez testified that on July 27, 2006, she received a telephone call from the police, who asked if she could leave work early and return home. She then spoke with her niece on her cellular phone, and her niece told her that there were many police officers at the apartment looking for Shelton. After hearing that, and as soon as she learned that her children were safe, Ms. Alvarez asked the police to leave her apartment until she returned home.[10] When she arrived home, she saw that the officers had complied with her request to leave the apartment. Then, the officers asked her to consent to a search of her apartment and presented her with a consent-to-search form, which she signed.

Ms. Alvarez testified at the suppression hearing that she decided not to ask the police to obtain a search warrant because she "just wanted everything to end." She further testified that she told the police that "they had already been through my home," but that the detective told her that she would "make it worse" by requiring the police to secure a warrant. According to Ms. Alvarez, she read the consent-to-search form prior to signing it, and the detective told her that she could refuse to

---

9. The sentences for counts 1, 2, 3, 4, 7, and 8 were to be served concurrently.

10. Ms. Alvarez was driven home by a Lincoln police officer because, at the time, Shelton was using her car.

consent. She testified, however, that she "really didn't feel like [she] had any choice." Finally, according to Ms. Alvarez, the police officers prevented her from contacting her attorney and from answering a call to her cellular phone from her attorney as she later gave her witness statement at the police station.

Central Falls Det. Jeffrey K. Araujo, who met Ms. Alvarez when she arrived at her apartment on July 27, 2006, testified that she signed the consent-to-search form "very willingly." He also testified that she at no point refused to sign the consent-to-search form. Rather, according to Det. Araujo, he and another detective read the form to her aloud after she read it herself. He testified that she told them that she understood the form. The detective characterized Ms. Alvarez "before, during, and after" the signing of the consent-to-search form as being "very compliant and very willing." Detective Araujo said that her primary concern appeared to be the safety of her children.

Pawtucket Det. Raymond Doran met Det. Araujo at Ms. Alvarez's apartment before she arrived home. He testified that upon her arrival, he explained the purpose of their investigation, informed her that the police had observed certain items in her bedroom, and asked for her consent to search. He insisted that he did not threaten her and that she was very cooperative with their investigation. Detective Doran said that he did not recall Ms. Alvarez asking him why he needed her consent to search if the police had already been in the apartment.[11]

According to Det. Doran, after Ms. Alvarez signed the consent-to-search form, she accompanied him and Det. Araujo into her bedroom. There, he testified, he removed the gun box from the backpack and opened it; inside he found two ammunition clips for a firearm. He said that he also found loose ammunition in the front pocket of the backpack. Detective Doran testified that he seized these items, in addition to the ski mask, gloves, backpack, and ammunition on the bed.

Detective William P. Magill, of the Pawtucket Police Department, testified that he and his partner, Det. Tina Goncalves, brought Ms. Alvarez to the Pawtucket police station to obtain a witness statement from her. He testified that she did not mention a desire to speak with her lawyer before she gave the statement. Further, Det. Magill said that he did not recall Ms. Alvarez's cellular phone ringing while she was in the interview room, nor did she ever express that her lawyer would be contacting her. Detective Goncalves testified that Ms. Alvarez never indicated to them that she wanted to speak with her lawyer, and the detective did not "recall there being a discussion about an attorney at all." Ms. Alvarez's attorney testified that he recalled speaking to Ms. Alvarez in late July, but he could not "remember the specifics" of their conversation. He recalled, "in general," having a conversation with Ms. Alvarez about the police search of her apartment.

The defendant argues that the trial justice erred when he denied defendant's motion to suppress because the state failed to establish that Ms. Alvarez's consent to search was voluntary. He contends that

---

11. At first, Det. Doran testified that he did not tell Ms. Alvarez that the evidence found in her apartment could be used against her and that he also did not discuss the possibility of the police obtaining a search warrant. However, after the trial justice directed his attention to the consent-to-search form, the detective acknowledged that the form included language informing her that she could refuse to consent to a search without a search warrant and that incriminating evidence could be used against her in court.

the trial justice erroneously disregarded evidence that the police officers "actively discouraged Miss Alvarez from talking to her Attorney" while she provided a witness statement, which, he argues, "is further proof that police used a heavy hand in dealing with Brenda Alvarez and that her consent * * * when she signed the form was not freely given." [12] Additionally, defendant maintains that the trial justice's "reliance upon exigent circumstances to justify the search was misplaced" and "the plain view exception based on exigent circumstances was [in]adequate to justify the seizure of the ski mask, gun box, gloves and ammunition." He argues that the officers improperly "attempted a short cut" around the warrant requirement by first seeking Ms. Alvarez's consent to search. Before this Court at oral argument, defendant did not challenge the trial justice's ruling that exigent circumstances justified the initial warrantless entry and protective sweep of Ms. Alvarez's apartment.

1

### Standard of Review

■ "In reviewing the trial justice's denial of defendant's motion to suppress the incriminating * * * evidence, we defer to the factual findings of the trial justice, applying a 'clearly erroneous' standard." *State v. Apalakis*, 797 A.2d 440, 443 (R.I. 2002) (quoting *State v. Page*, 709 A.2d 1042, 1044 (R.I.1998)). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. Humphrey*, 715 A.2d 1265, 1273 (R.I.1998) (quoting *State v. Baton*, 488 A.2d 696, 701 (R.I.1985)). "With respect to questions of law and mixed questions of law and fact involving constitutional issues, however, this Court engages in a *de novo* review in accordance with *Ornelas v. United States*, 517 U.S. 690[, 116 S.Ct. 1657, 134 L.Ed.2d 911] * * * (1996)." *Apalakis*, 797 A.2d at 443 (citing *Page*, 709 A.2d at 1044). Therefore, the determination of the voluntariness of an individual's consent to search is reviewed by this Court *de novo*. *State v. Texter*, 923 A.2d 568, 576–77 (R.I. 2007) (citing *State v. Dennis*, 893 A.2d 250, 261 (R.I.2006) and *State v. Wiggins*, 919 A.2d 987, 989 (R.I.2007)). However, "[n]otwithstanding our *de novo* review of the ultimate determination of voluntariness, we give deference to the findings of historical fact made by a trial justice in the context of making that determination." *Id.* at 577 (citing *In re Joseph B.*, 822 A.2d 172, 174 (R.I.2003), *State v. Lombardi*, 727 A.2d 670, 673 (R.I.1999), and *State v. Cline*, 122 R.I. 297, 303, 405 A.2d 1192, 1196 (1979)).

2

### Analysis

■ "It is well settled that 'a search conducted pursuant to a valid consent is constitutionally permissible.'" *Texter*, 923 A.2d at 576 (quoting *State v. Hightower*,

---

12. The trial justice rejected the assertion that the officers prevented her from speaking with her attorney prior to and while she gave a witness statement to the police. However, because this alleged contact between Ms. Alvarez and her attorney occurred after she gave the police consent to search her apartment and after the search was conducted, we fail to see how it bears any relevance to the question of whether or not Ms. Alvarez's consent was voluntary. *See State v. Humphrey*, 715 A.2d 1265, 1273–74 (R.I.1998) (noting that this Court "need not consider" allegedly harsh police treatment of the defendant in an analysis of the voluntary nature of a confession where the treatment "actually is alleged to have occurred *after* his confession of guilt had already been made" because it "would not affect the constitutional validity of his voluntary confession").

661 A.2d 948, 960 (R.I.1995)). Nonetheless, to ensure that the requirements of the Fourth Amendment have been fulfilled, "[t]he state bears the burden of proving, by a preponderance of the evidence, that a defendant has freely and voluntarily given consent to a search." *Id.* (citing *State v. Casas*, 900 A.2d 1120, 1134 (R.I.2006) and *State v. O'Dell*, 576 A.2d 425, 427 (R.I.1990)). The trial justice ruled that the state met this burden.

After the hearing, the trial justice found that Ms. Alvarez was "a strong-willed individual," and he did not "believe for one minute that [her] will was overborne." He further found that the consent-to-search form, which was read to Ms. Alvarez, gave her "a very clear option" about whether to grant the officers consent to search or, alternatively, to require that they obtain a warrant. He found that she wanted to cooperate with the police, and he "absolutely reject[ed] her allegation that she had no choice but to sign that consent-to-search form." Finally, the trial justice found that Ms. Alvarez and her lawyer did not attempt to reach each other "until much later," and thus he rejected her claim that the officers prevented her from speaking with her attorney prior to and while she gave a witness statement to the police.

In our view, the officers properly sought Ms. Alvarez's consent. Exigent circumstances, based on credible information that an armed suspect might be in Ms. Alvarez's apartment, reasonably justified their initial warrantless entry into her home to effectuate a security sweep. Those circumstances could not justify a more intensive search absent a warrant or some exception to the warrant requirement, such as voluntary consent to search from Ms. Alvarez. *See Texter*, 923 A.2d at 576; *State v. Portes*, 840 A.2d 1131, 1136 (R.I. 2004); *see also State v. Jennings*, 461 A.2d 361, 367 (R.I.1983) ("When the security check has been completed, the area is secured, and there is no longer any danger of the loss or destruction of evidence, the search must cease."). While he was lawfully on the premises, an officer viewed several items of potential evidentiary value in Ms. Alvarez's bedroom. That observation legitimately served as the impetus for a request of Ms. Alvarez that she consent to a search of her apartment.[13] Thus, after completing their initial sweep for a suspect or victim, the police correctly recognized that they could search no further under the exigent-circumstances doctrine, and they then properly sought and secured Ms. Alvarez's consent to search.

After careful and independent review of the record, mindful that we must view the trial justice's findings of fact through a prism of deference, it is our opinion that Ms. Alvarez voluntarily consented to a search of her apartment, and the police's subsequent search and seizure of evidence from her bedroom easily passes constitutional muster. *See Texter*, 923 A.2d at 576. Although Ms. Alvarez later testified that she gave the officers consent to search her apartment because she "just wanted everything to end" and further that she was aware that the police had already been in her apartment, particularly her bedroom, when they performed the protective sweep, this merely represents her rationale for providing consent; it does not preclude a determination that her consent was given voluntarily. We give defer-

---

13. We need not determine whether the plain-view doctrine applies because the police officers did not seize evidence on this basis. *See State v. Portes*, 840 A.2d 1131, 1138 (R.I.2004) (explaining that "a police officer may seize evidence in plain view when he is lawfully in a position that allows him to see the evidence and it is immediately apparent to the officer that the object is evidence of criminality").

ence to the trial justice's credibility determinations, his findings that Ms. Alvarez was "strong-willed," desired to cooperate with the police, and was given a "clear option." As a result, we hold that the trial justice properly denied defendant's motion to suppress the items seized from Ms. Alvarez's bedroom on the basis of her voluntary consent to search.

## B

### Disclosure of the Length of Shelton's Suspended Sentence

Prior to trial, the defense and prosecution agreed that Ms. Lang would not be questioned about the length of time Shelton said he would likely be incarcerated if he was charged with possession of cocaine.[14] During the trial, defense counsel played a recording of Ms. Lang's July 28, 2006, statement to the police and distributed a corresponding transcript to the jury. However, defense counsel inadvertently played and distributed unredacted versions of the statement, which included the portion of Ms. Lang's statement indicating that Shelton had told her that the drug charge would result in "six to ten years for me." The defense then requested that there be no further inquiry on that issue.

The trial justice ruled that the unredacted statement was relevant and admissible. He said, "Under Rule 403, in my judgment, it is interwoven with the offense on trial and directly supports a finding of guilty knowledge, as well as motive and intent, and it allows the jury to hear a completely coherent story. The mere fact that it might be prejudicial does not render it inadmissible." In view of counsel's inadvertence in providing the information to the jury, the trial justice characterized

the issue of Shelton's suspended sentence and his reasons for urging Ms. Lang to take responsibility for possession of the cocaine as "fair game" for the basis of further inquiry by either party. After Ms. Lang testified on the state's redirect examination about Shelton's fear of violating his probation and possibly facing jail time if he accepted responsibility for the drug charge, the trial justice interjected to address the jury. He addressed the panel as follows:

"testimony that purportedly reflects the defendant's having been on a suspended or probationary term for a criminal offense is offered to you for a very limited purpose, and that is, to the extent you consider it, * * * for the purpose of a defendant's motive or his intent or his plan as it may affect the charges before you."

After further discussion between counsel and the trial justice about how the state may proceed on the issue, the defense restated its objection to the disclosure of the length of defendant's suspended sentence, arguing that it would be "extremely prejudicial" for the jury to learn of it. The trial justice overruled the objection and gave the defense the choice of the jury receiving this information through a stipulation or through the presentment of a certified copy of Shelton's previous conviction. Defense counsel chose to have the trial justice inform the jury of defendant's seventeen-year suspended sentence at the time he informed the jury that defendant was convicted of a felony in 2001. The trial justice so notified the jury.

The defendant argues on appeal that the trial justice erred when he allowed disclosure of the length of defendant's suspended sentence for a prior conviction, because

14. We agree with the trial justice that the prosecutor was "generous" in making this agreement.

this information "was unnecessary and severely prejudicial to him." In addition, he contends that the trial justice "compound[ed]" this error when he ruled that "the subject is fair game now" for inquiry. The defendant maintains that the admission of the term of the suspended sentence violated Rule 403 of the Rhode Island Rules of Evidence.[15]

## 1

### Standard of Review

"Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *State v. Hak,* 963 A.2d 921, 928 (R.I.2009). The admission or exclusion of evidence "under Rule 403 is within the sound discretion of the trial justice." *Blue Coast, Inc. v. Suarez Corp. Industries,* 870 A.2d 997, 1007 (R.I.2005) (citing *State v. Martinez,* 824 A.2d 443, 449 (R.I.2003)). Even so, "this Court has said that 'the discretion to exclude evidence under Rule 403 must be exercised sparingly.'" *Hak,* 963 A.2d at 928 (quoting *State v. Patel,* 949 A.2d 401, 412 (R.I.2008)). However, "[t]his [C]ourt will not reverse the trial justice's determination unless it constitutes a clear abuse of discretion." *State v. Tempest,* 651 A.2d 1198, 1216 (R.I.1995) (citing *Cuddy v. Schiavonne,* 568 A.2d 1387, 1389 (R.I.1990)).

## 2

### Analysis

In our opinion, the trial justice did not abuse his discretion when he ruled that the jury would be informed about the length of Shelton's suspended sentence, and when he ruled that inquiry would be permitted about his statement to Ms. Lang that his probationary status would result in "jail time" for him. In the first place, as the trial justice noted, the state's agreement with the defense to keep this information from the jury was "overly generous." When it was disclosed in the unredacted recording and transcript of Ms. Lang's statement, occasioned by an error of the defense, the agreement effectively became meaningless.

Under Rule 403, "[i]t is only evidence that is marginally relevant and enormously prejudicial that must be excluded." *Hak,* 963 A.2d at 928 (quoting *Patel,* 949 A.2d at 412–13). Indeed, "[a]ll evidence tending to prove guilt in a criminal trial is prejudicial to a defendant." *Id.* (quoting *State v. DeJesus,* 947 A.2d 873, 884 (R.I.2008)). Here, the jury already was going to hear by way of stipulation that Shelton previously had been convicted of a felony. Thus, the evidence of the length of his suspended sentence and probationary period would not be so enormously prejudicial that it would require its exclusion under Rule 403. Additionally, "[e]vidence of other conduct, even of a criminal nature, may be received if it is interwoven with the current charge in a way that tends to establish 'guilty knowledge, intent, motive, * * * or the like.'" *State v. Woodson,* 551 A.2d 1187, 1193 (R.I.1988) (quoting *State v. Beaulieu,* 116 R.I. 575, 579, 359 A.2d 689, 691 (1976)); *see* Rule 404(b) of the Rhode Island Rules of Evidence ("Evidence of other crimes, wrongs, or acts * * * may, however, be admissible for other purposes, such as proof of motive * * *."). The evidence that Shelton was serving a seventeen-year

---

15. Rule 403 of the Rhode Island Rules of Evidence provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

suspended sentence at the time that he urged a reluctant Ms. Lang to "take the drug charge" for him so that he could avoid jail time tended to establish his motive to prevent Ms. Lang from implicating him at her August court date. Importantly, though the prejudicial effect of this evidence was minimal, the trial justice nonetheless undertook "adequate safety measures * * * to protect defendant" from undue prejudice when he instructed the jury about the "very limited purpose" for which the evidence was offered. *See Woodson*, 551 A.2d at 1193–94. Therefore, we hold that the trial justice's evidentiary ruling to admit this evidence of defendant's suspended sentence and probationary period and allow inquiry about Ms. Lang's unredacted statement was wholly within his discretion under the Rhode Island Rules of Evidence, because this evidence was relevant, not unduly prejudicial, and tended to demonstrate motive.

## C

### Sentence

Shelton argues that his "sentencing was cruel and unusual and/or incorrect in violation" of the United States and Rhode Island Constitutions. He asserts that the trial justice erred when he sentenced him to two consecutive life terms, the consecutive nonparolable sentence of twenty-five years as a habitual offender, and the consecutive seventeen years to serve as a violator of his probation. In addition, he contends that his conviction on count 3 (assault of Julie Lang with a dangerous weapon in a dwelling with intent to murder), count 7 (illegally carrying a pistol without a license), and count 8 (unlawful possession of a firearm following conviction of a felony) "result[ed] in an injustice"

because the "three counts should merge into the assault with intent to murder." Further, defendant argues that the counts of conspiracy also should have been merged.

### 1

### Merger

■ The defendant did not preserve for review his argument that several of the counts violated the Double Jeopardy Clauses of the United States and Rhode Island Constitutions.[16] *See State v. Scanlon*, 982 A.2d 1268, 1277 (R.I.2009). Such a defense "must be raised in a pretrial motion to dismiss under Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure." *Scanlon*, 982 A.2d at 1277 (citing *State v. Day*, 925 A.2d 962, 977 (R.I.2007)). Under Rule 12(b)(2), the failure to raise the defense of double jeopardy or merger "constitutes a waiver thereof." Although the rule also provides that "the court for cause shown may grant relief from the waiver," *id*, we have held that "the strong policy favoring the pretrial presentation of a double-jeopardy motion bars its use at such a late post-trial date absent some compelling reason * * *." *State v. McGuy*, 841 A.2d 1109, 1115 (R.I.2003) (citing *State v. Pearson*, 49 R.I. 386, 391, 143 A. 413, 415(1928)).

The defendant has not presented a compelling reason for this Court to grant relief from the waiver of his merger argument occasioned by his failure to raise it in a pretrial motion to dismiss. We acknowledge that Shelton's trial occurred approximately two months before this Court's opinion in *Day*, 925 A.2d at 977, "made the law explicitly clear." *Scanlon*, 982 A.2d at 1277. However, although we considered

16. "We have previously indicated that a merger argument 'is essentially a double jeopardy argument.'" *State v. Day*, 925 A.2d 962, 977 (R.I.2007) (quoting *State v. Grayhurst*, 852 A.2d 491, 500 (R.I.2004)).

the defendant's unpreserved double-jeopardy argument in *Scanlon,* where the trial also occurred before our opinion in *Day* "focused with maximal explicitness on the necessity of bringing a merger argument to the attention of the trial court through a pretrial Rule 12(b)(2) motion," we decline to do so here.[17] *Day,* 925 A.2d at 977; *see Scanlon,* 982 A.2d at 1277. This is so because here, unlike the situations in *Scanlon* and *Day,* the merger issue was not raised before the trial justice at any stage of the proceedings, and the trial justice did not rule on the issue. *Cf. Scanlon,* 982 A.2d at 1277 (considering unpreserved double-jeopardy argument because "the trial justice nonetheless entertained argument on this issue when he heard defendant's motion for judgment of acquittal and he ruled on the issue"); *Day,* 925 A.2d at 977 (entertaining untimely merger argument "because the trial justice did address the merger argument when he ruled on defendant's motion for a judgment of acquittal"); *State v. Grullon,* 117 R.I. 682, 687–88, 371 A.2d 265, 268 (1977) (reaching merits of procedurally flawed double-jeopardy argument because the "waiver of procedural deficiencies at the discretion of the trial justice and his hearing on the merits of the motion * * * allows us to review this as if it were a [Rule] 12(b)(2) motion"). Therefore, this case does not "give rise to one of the limited situations wherein this court will address a double jeopardy claim despite its improper assertion." *State v. Thomas,* 654 A.2d 327, 330–31 (R.I.1995) (citing *Grullon,* 117 R.I. at 687–88, 371 A.2d at 268 and *Thornley v. Mullen,* 115 R.I. 505, 510–11, 349 A.2d 158, 161 (1975)). Under Rule 35 of the Superior Court Rules of Criminal Procedure, however, the appeal of this issue is dismissed without prejudice, and defendant may seek relief in the Superior Court within 120 days of this opinion.[18] *See Thomas,* 654 A.2d at 331 (dismissing double-jeopardy argument without prejudice under Rule 35 because of "defendant's failure to present a procedurally proper double-jeopardy defense").

2

**Length of Sentence**

 The state argues that this Court may not properly consider defendant's "various constitutional challenges to his sentence" on direct appeal, "but must await review upon any denial of a Rule 35 motion." We agree with the state because, after review of the record, we observe that Shelton has not filed a motion to reduce his sentence under Rule 35. It is well settled that:

> any time. The court may correct a sentence imposed in an illegal manner and it may reduce any sentence when a motion is filed within one hundred and twenty (120) days after the sentence is imposed, or within one hundred and twenty (120) days after receipt by the court of a mandate of the Supreme Court of Rhode Island issued upon affirmance of the judgment or dismissal of the appeal, or within one hundred and twenty (120) days after receipt by the court of a mandate or order of the Supreme Court of the United States issued upon affirmance of the judgment, dismissal of the appeal, or denial of a writ of certiorari."

17. Although our opinion in *Day* fully elucidated the necessity to raise merger and double-jeopardy arguments in a pretrial Rule 12(b)(2) motion, this Court on numerous occasions opined on this requirement prior to the date of defendant's trial. *See, e.g., State v. Feliciano,* 901 A.2d 631, 647 (R.I.2006); *Grayhurst,* 852 A.2d at 500–01; *State v. Haney,* 842 A.2d 1083, 1084 (R.I.2004); *State v. McGuy,* 841 A.2d 1109, 1115 (R.I.2003).

18. Rule 35 of the Superior Court Rules of Criminal Procedure provides, in relevant part:
"(a) *Correction or reduction of sentence.* The court may correct an illegal sentence at

"in the absence of 'extraordinary circumstances,' this Court will not consider the validity or the legality of a sentence on direct appeal. * * * Rather, we have repeatedly held that the proper procedure for a review of a sentence begins in the Superior Court under Rule 35 of the Superior Court Rules of Criminal Procedure. * * * In the event that a defendant continues to be aggrieved by the ruling of the Superior Court, this Court then will review the decision on appeal." *State v. Hesford*, 900 A.2d 1194, 1198 (R.I.2006) (quoting *State v. Bettencourt*, 723 A.2d 1101, 1114 (R.I.1999)).

We hold that no extraordinary circumstances exist to warrant our consideration of the validity of defendant's consecutive sentences on direct appeal. *See State v. Girard*, 799 A.2d 238, 253–54 (R.I.2002) (holding that no extraordinary circumstances existed to justify considering the premature argument that the trial justice improperly sentenced him to consecutive sentences). Therefore, "[t]he statutory 120–day period in which to seek Superior Court review of the sentence commences on the date of this opinion should the defendant choose to file such a motion * * *." *Bettencourt*, 723 A.2d at 1114.

## III

### Conclusion

For the reasons stated herein, we affirm the judgment of conviction. The record shall be remanded to the Superior Court.